[No. 4049.   Decided January 16, 1902.]

WILLIAM E. ELDRIDGE, *Respondent,* v. YOUNG AMERICA
AND CLIFF CONSOLIDATED MINING COMPANY, *Appellant.*

CONTINUANCE — RIGHT TO — AMENDMENT OF PLEADING AT TRIAL.

In an action for the rescission of a contract on the ground of
fraud, it was error for the court to refuse a continuance to de-
fendant, where the plaintiff on the trial had been allowed to
amend his complaint so as to set up an additional fraudulent
representation, and the testimony of the only witness for defend-
ant who could disprove the allegation had been taken by deposi-
tion in another state before that issue had been raised.

FRAUDULENT REPRESENTATIONS — WAIVER.

Where a party, after the discovery of facts tending to show
fraud in inducing him to enter into a contract for the purchase
of property, is silent, and continues to treat the property as his
own, he will be held to have waived the fraud and to be bound
by the contract.

SAME — PRESUMPTION AS TO FALSITY.

The single fact that a representation is false does not of
itself raise a presumption of knowledge of its falsity.

Appeal from Superior Court, Spokane County.—Hon.
WILLIAM E. RICHARDSON, Judge. Reversed.

*Frank T. Post* and *F. W. Dewart,* for appellant.

*Stoll & Macdonald,* for respondent.

The opinion of the court was delivered by

MOUNT, J.—This action was brought by respondent
against appellant in the court below to rescind an executed
contract for the purchase of 40,000 shares of the capital
stock of appellant company, and for the return of $10,000
paid therefor, on the ground of false and fraudulent repre-
sentations made by the agent of appellant in inducing res-
pondent to purchase the stock.   These fraudulent repre-

sentations are enumerated in the amended complaint substantially as follows: (1) That there were 25,000 tons of concentrating ore on the dump of the company, of the average value of $27 per ton; (2) that there were from 25,000 to 30,000 cubic yards of ore in sight, of a value in excess of the capital stock of the company, towit, $1,000,-000; (3) that the actual market value of the stock was twenty-five cents per share; (4) that a dividend of one cent per share would be paid the stockholders on February 15, 1899, and at regular monthly intervals thereafter; (5) that all sums of money derived from sales of stock should be converted into the treasury of the company and expended on the company's property. At the trial of the case, and over the objection of appellant, the court permitted an amendment to the complaint, making another ground, viz., (6) that one Ehlers and one Chamberlain had each purchased 25,000 shares of the stock of the company, paying $6,000 therefor, all of which representations were false, and known to be such at the time they were made. Appellant, in its answer to the amended complaint, admitted the purchase of the stock at twenty-five cents per share by the respondent; denied the agency of Baker, who had sold the stock, denied the fraudulent representations; and alleged a ratification of the purchase by plaintiff after the purchaser had knowledge of all the facts alleged as fraud. The cause was tried by the court without a jury. The evidence in the case was principally taken upon depositions. The court found all the facts in favor of plaintiff below (respondent here), and entered a decree rescinding the contract and giving judgment in favor of plaintiff for $10,-000 against the defendant company. Defendant appeals, and the cause is here for trial de novo.

The .undisputed facts are substantially as follows: In the spring of 1898 J. E. Baker and others purchased a majority of the stock of the Young America & Cliff Consolidated Mining Company, a corporation, which had a capital stock of $1,000,000, divided into 1,000,000 shares. Eight hundred thousand of these shares were outstanding and 200,000 thereof were in the treasury of the company. The company was the owner of four mining claims situated near Bossburg, in Stevens county, Washington. At the first meeting of. the stockholders after the above named purchase of stock by Baker and others, Baker was elected president, and became 'manager in fact without salary. The company thereupon began the construction of an air compressor plant and a concentrating plant, for the purpose of mining and reducing the ores of said properties. Money was needed by the company to carry on this work. Thereupon Baker was authorized by the company to sell the treasury stock at six cents per share, and in September, 1898, went to New York in order to sell this stock and purchase machinery for the mine. Learning that the company would not have money enough at six cents per share, he voluntarily informed the company that he would make the shares ten cents to the company. In New York city, Baker entered into an arrangement with W. S. Chamberlain, a broker, to sell the stock for him, and agreed to pay Chamberlain one-half of all money received over ten cents per share, and, in addition, one share of stock from Baker's own personal stock for each two shares sold. He also entered into a similar arrangement with R. J. Ehlers and Jacob Colonel of New York. The corporation had no dealings with these brokers. Baker turned into the treasury of the company ten cents for each share sold. There was sold during September, 1898, about 100,000 shares at 12½ cents a share; during October and November,

60,000 shares at twenty-five cents a share; 40,000 of these shares were sold to respondent herein. Thereafter about 40,000 shares were sold at from twenty-five to fifty cents per share. The company received from Baker something over $19,000 for the sales of treasury stock. There was spent on the mine altogether some $28,000, of which Baker contributed out of his own private funds some $9,000. Early in November, 1898, Chamberlain sold stock to one H. G. Rommel of Newark, New Jersey, and introduced Baker to Rommel. Rommel introduced several parties to Baker and Chamberlain, among them the plaintiff, Eldridge. At the first meeting of Baker and Eldridge there was some talk concerning the mine. Subsequently Baker showed Eldridge samples of ore from the mine; the report of a Mr. Hamer, the mining expert upon whose representations Baker had purchased the property; the returns of a carload of ore shipped from the mine to the Tacoma smelter; a telegram from the editor of the Bossburg Journal that the mine was able to pay dividends; a telegram from the secretary of state of Washington that the company was organized under the state laws; some assay certificates; and photographs of the mines and buildings in course of construction. Baker also told Eldridge that he was not an expert miner, but that he had been a bank cashier in Illinois, had lost his health and money, and gone to Puget Sound, where for the last couple of years he had been engaged in selling mines. At this time Baker told Eldridge that there was 25,000 tons of concentrating ore on the dump which would average $27 to the ton; that there was also in the mines 25,000 or 30,000 tons of concentrating ore not knocked down, and that the value of the ore "in sight" and on the dumps was in excess of the capitalization of the company; that he had been selling the stock at twenty-five cents per share; that a divi-

dend of one cent per share would be paid on February 15, 1899, and regularly thereafter; that the money realized on the sales of stock was to be expended for machinery for the mine. He also gave Eldridge a list of persons to whom he had sold stock, among them Ehlers, who upon inquiry by Eldridge, confirmed Baker's statements. Eldridge at this time did not know that Ehlers was a broker. Eldridge was not experienced in mining affairs, but expressed a willingness to invest $15,000 in the stock, at twenty-five cents a share, if he could go to Bossburg and see the property. Baker, being unwilling to wait for such a time, agreed to give Eldridge an affidavit containing the main facts, and accordingly made an affidavit (1) that he was president of the company; (2) that the company owned four mining claims at Bossburg; (3) that there was 25,-000 tons of ore on the dump and 25,000 to 30,000 cubic yards of ore in sight in the mine; that a concentrator, etc., were being erected on the property. Of these statements all were correct, except the third, and Baker at the time believed that to be true. Upon this affidavit being delivered to Eldridge, he paid Baker cash for 40,000 shares of the stock. A few days later Baker left for the mine, and Eldridge and Ehlers came on a few days after, arriving at Bossburg on December 22, 1898. They were met by Baker, who showed them the outside works and machinery. The ground being covered with snow, Eldridge could not see the ore in the dump. Baker also introduced Eldridge and Ehlers to Hamer, the expert who had made the report on the mine; and he, at Baker's request, showed Eldridge and Ehlers through the underground workings of the mine. After Eldridge had seen the property he expressed himself as well pleased with it, and sent a telegram to that effect to his friend, H. G. Rommel, Newark, New Jersey. That same evening Eldridge purchased 2,000 shares more

of stock at twenty-five cents per share, and gave his note in payment. This note was paid at its maturity. No representations were made to Eldridge after he had purchased his stock. When the mill was put in operation thereafter, it was found that the water supply was insufficient; that the ore contained so much zinc that the machinery would not separate the lead therefrom, and was inadequate to properly work the ores. In the spring of 1899 Baker employed another expert to examine the mine, and then learned for the first time that the amounts of ore in the dumps and in the mine, as given by Hamer, were incorrect. On May 31, 1899, Eldridge again came to Bossburg and looked over the mine, and while he and Baker were in the mine a cave-in caught Baker and injured his spine so that he could not personally attend to the mine thereafter; and within a few days the work on the mine was stopped and the mine closed down. On June 1, 1899, prior to the time that Baker was hurt, he told Eldridge that he had had another expert examine the property, and that there was no valuable ore in the dump, and that it was a "dream." Eldridge and Baker at this time discussed the best thing to do and how to work the mine, Eldridge expressing no dissatisfaction with his bargain. After this Eldridge made a proposition to Baker that if he (Baker) would give him an option on the controlling interest, he would pay the pay roll of the company then due, and go on and work the property. Baker refused this, and shortly afterwards went to his home at New Whatcom, Washington. In July, 1899, Eldridge visited Baker at New Whatcom, and expressed dissatisfaction because of the failure of the mine to pay dividends, and said to Baker that he ought to have his money back. Up to this time Eldridge had expressed no objection to anything that had taken place, and in this conversation, and

also while in San Francisco, stated to Baker that he believed that Baker was honest in all the statements he had made concerning the mine.   On July 22, 1899, Eldridge called on Baker at his room in Seattle, and they talked over the best way to work the mine, and, as both were going to San Francisco, agreed to meet there, and when they met, on the 27th or 28th of July, 1899, went together to a machinery house to see if they could find machinery which would eliminate the zinc.   They there found a machine which was represented to be adequate for the purpose, and they decided to have some of the ore shipped to San Francisco and have tests made, and, if the machinery would do the work, purchase the machine.   Thereafter Baker was confined to his bed, and before his recovery this action was brought.   After the suit was begun, an expert, at the request of Baker, examined and measured all the ore on the dumps and in the mine, and estimated that there were 6,118 tons of waste ore, of the value of 47 cents per ton, and 224 tons of the aggregate value of $1,700, net value of $853; and he estimated ore in sight in the mine at 1,056 2-3 tons of the aggregate value of $15,240, net value of $10,000.

There are some disputed facts in the case, as follows: Baker testified that, before the time of the sale, he informed Eldridge that he was not a mining man himself; that what information he had concerning this property he had obtained from others, and that he informed Eldridge of this, and told him that the estimated amounts of ore on the dump and in the mine were all taken from the reports of the experts who had examined the property; that he believed the reports to be correct, and that Eldridge saw and read these reports; that he was not asked concerning commissions and made no statements concerning the same; that he stated that the net proceeds of the

sales of stock were to be used in the mine. He also testified
that at the time of the purchase of the stock he had an
agreement with Eldridge that the money should be held
until Eldridge could examine the property, and if, after
such examination, he was not satisfied, the money should
be returned to him; that when Eldridge came to Bossburg
he still held the money, and after Eldridge looked over
the mine he offered to buy back Eldridge's stock, but El-
dridge declined, stating he was satisfied. Baker also testi-
fied that he offered Eldridge at that time $1,000 for an
option on his stock for six months at a dollar a share, and
that Eldridge refused to accept the offer. Baker also
testified that both Chamberlain and Ehlers were brokers
in his employ, and that Eldridge knew Mr. Chamberlain's
business. Eldridge denied all these statements. No evi-
dence was given by Baker as to whether Eldridge knew
that Ehlers was also acting as a broker in the transaction.
It clearly appears from all the evidence in the record
that there was no actual, intentional fraud practiced by
Baker; but, on the other hand, the evidence conclusively
shows that, so far as the transaction of the sale of the
stock to Eldridge was concerned, Baker actually believed
and had reason to believe that all the representations made
to Eldridge were absolutely true, with the exception of the
fact that Chamberlain and Ehlers were actual, *bona fide*
purchasers of 25,000 shares of stock for $6,000 cash, each.
The evidence of this fact is found only in the testimony
of Mr. Eldridge, whose deposition was taken some two
months after that of Mr. Baker. At the time Baker's
deposition was taken in California, this fact was not in
issue and not alleged as ground of rescission of the con-
tract, Baker was not asked concerning it and gave no
evidence upon this question. The testimony of Eldridge

is to the effect that before the purchase of the 40,000 shares of stock he asked Ehlers if he had purchased stock, and Ehlers stated he had, and that he paid $6,000 therefor. He further testifies that, at the conversation with Baker at his home in New Whatcom, Baker told him that Ehlers paid nothing for the stock, and this was the first knowledge he had of that fact.

At the trial, plaintiff asked the court for leave to amend the complaint by inserting an allegation of fraud upon this ground; and, over the objection of the defendant, the court, after denying the request for a continuance so as to give defendant an opportunity to meet this allegation, permitted the amendment and made a finding thereon. Under these circumstances the court should have denied the application to amend, or should have granted the continuance requested. We are satisfied from the record that whatever fraudulent representations there were, if any, binding upon the company, the undisputed evidence in the case shows a subsequent ratification by the plaintiff, which prevents, in this case, a rescission of the purchase of the stock. After the purchase of the stock the plaintiff visited the mine, on December 22, 1898, and saw the condition of the mine and the mill in the course of construction. At that time, it is true, the dumps were covered with snow and he had no opportunity to inspect them. At this time, after seeing the general condition of things, he purchased 2,000 shares for a friend with whom he had agreed to sell 2,000 shares of his own 40,000, so that his 40,000 might remain intact. The effect of this purchase was 2,000 shares for himself. He also telegraphed another friend as follows: "Young America mine better than reported. Delighted with conditions." He visited the mine in June of the year

following, when there was no snow on the dumps or about the mine, and after the time when dividends should have been paid, and at this time had ample opportunity to satisfy himself of all the conditions of the property and of the standing and condition of the company, and must have known both at this time and on the former visit that the representations that the mine would pay dividends was merely the expression of an opinion of Mr. Baker. At this time, when the machinery was not working well and all were disappointed with the results accomplished, and after information that the dumps were a "dream," and the ore therein had proven unprofitable, the plaintiff negotiated with Baker for a controlling interest, and was refused. He made no mention of a disaffirmance, but his acts were still of confirmation. Subsequently, in July, at Baker's home in New Whatcom, after Baker had informed him that Ehlers had paid nothing for his stock, he stated that the mine had not come up to expectation, had not paid a dividend, that he ought to have his money back, but that he would not bother Baker; and even after this conversation, in Seattle and in San Francisco, he and Baker discussed the best means of extracting the zinc from the lead, and examined machinery with this end in view. It seems from these circumstances that these acts of Eldridge, after knowledge of all the facts, clearly show a ratification. While there was probably in his mind a consciousness that the investment could not turn out as he had believed it would, he was still relying upon the investment, with the intention of making the most of it. These circumstances certainly do not make it clear that it was the discovery of fraud, and not the failure of the enterprise, which impelled him to seek a rescission of his contract. After the enterprise had practically failed, and all the parties realized that the success of the undertaking

was at least doubtful, and all the facts were known to him, and after he had been refused a controlling interest in it, he was still negotiating for machinery which might make it a success.    These are not the actions of the ordinarily careful business man, who has been defrauded and knows it, but are the actions of one who is unsuccessful in an enterprise, and show almost conclusively that the failure of the enterprise impels him to seek a rescission, and not the fraud, if there was any fraud.

In the case of *Grymes v. Sanders,* reported in 93 U. S. 55, the court says:

"A mistake as to a matter of fact, to warrant relief in equity, must be material; and the fact must be such that it animated and controlled the conduct of the party.    It must go to the essence of the object in view, and not be merely incidental.    The court must be satisfied that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved;"—

citing Kerr, Fraud & Mistake, 408; *Trigg v. Read,* 5 Humph. 529 (42 Am. Dec. 447); *Jennings v. Broughton,* 17 Beav. 541; *Thompson v. Jackson,* 3 Rand. 507 (15 Am. Dec. 721); *Harrod's Heir v. Cowan,* Hardin, 543; *Hill v. Bush,* 19 Ark. 522; *Juzan v. Toulmin,* 9 Ala. 662 (44 Am. Dec. 448).

"Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it.    If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred.    He is not permitted to play fast and loose.    Delay and vacillation are fatal to the right which had before subsisted.    These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value;"—

citing *Thomas v. Bartow,* 48 N. Y. 200; *Flint v. Wood,* 9 Hare, 622; *Jennings v. Broughton,* 5 De Gex, M. & G. 139; *Lloyd v. Brewster,* 4 Paige, 537 (27 Am. Dec. 88); *Saratoga & S. R. R. Co. v. Row,* 24 Wend. 74 (35 Am. Dec. 598); *Minturn v. Main,* 3 Seld. 220; 7 Rob. Pr., ch. 25, § 2, p. 432; *Campbell v. Fleming,* 1 Ad. & El. 41; Sugden, Vendors (14th ed.), 335; *Diman v. Providence, W. & B. R. R. Co.,* 5 R. I. 130.   In Bigelow on Frauds, it is said at page 434:

"For the party to treat the contract as if still binding, after he has discovered that he was drawn into it by fraud, will ordinarily have the effect to waive the right to treat it as invalid."

At page 436 it is said:

"The defrauded party to a contract has but one election to rescind the same.   If he once determine his election, it is determined forever.   Hence if it be shown that he has at any time after knowledge of the fraud, either by express words or by unequivocal acts, affirmed the contract, his election is irrevocable."

To the same effect, see Kerr, Fraud & Mistake, p. 298 *et seq.;* 2 Parsons, Contracts (8th ed.), 906, \* p. 871 *et seq.;* 2 Pomeroy, Equity Jurisprudence (2d ed.), § 964; 2 Addison, Contracts (Abbott & Wood), p. 776, \* p. 1178 *et seq.*   This rule is based upon sound principles, and is peculiarly applicable in this case.   Before the sale had been consummated, Eldridge says, he was willing to invest $15,000 in the property if he could have the benefit of his own eyesight,—if he could go there and look at it; and a very few days thereafter he did go and look at it, and expressed himself as satisfied.   If he had waited until that time before he purchased the stock, and then had purchased $15,000 worth of stock at twenty-five cents per share, he certainly could not have rescinded his contract. *Southern Development Co. v. Silva,* 125 U. S. 248 (8

Supt. Ct. 881). At that time he saw the condition of the machinery, and must have known that the ore in the mine, estimated at from 25,000 to 30,000 cubic yards, was but an expression of opinion, and also that the dividends must, of necessity, depend upon the operation of the mill. There was no indication of dissatisfaction or of a rescission of his contract. And later, after he was in possession of all the facts, he is treating the property as his own. His acts from the time he first saw the property until this action was brought were acts of ratification. The fact that the investment proved a failure and did not realize to him the large profits he expected is no ground for relief, after the money has all been spent upon the property. There is no evidence in the case that the company,. or the agent who made the representations, knew that they were false at the time they were made, and the only evidence in support of this fact is that the representations afterwards proved to be incorrect, and for that reason false. "The law raises no presumption of knowledge of falsity from the single fact *per se* that the representation was false." *Southern Development Company v. Silva, supra.* On the other hand, the evidence is very strong that Baker believed all the representations to be true. He devoted his time, without pay, and his private means, to the success of the enterprise, and, after he was severely injured, refused to part with the control of the property.

There are many other questions presented by both appellant and respondent, but this view of the case makes the consideration of other questions unnecessary. The cause will be reversed, with instructions to the lower court to dismiss the same.

REAVIS, C. J., and DUNBAR, HADLEY, FULLERTON, WHITE and ANDERS, JJ., concur.