# SOUTHERN DEVELOPMENT COMPANY *v.* SILVA.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 1210. Submitted January 9, 1888. — Decided March 19, 1888.

The general rule that when the answer of the defendant in a cause in equity is direct, positive, and unequivocal in its denial of the allegations in the bill, and an answer on oath is not waived, the complainant will not be entitled to a decree unless these denials are disproved by evidence of greater weight than the testimony of one witness, or by that of one witness with corroborating circumstances, applies when the equity of the complainant's bill is the allegation of fraud.

In order to rescind a contract for the purchase of real estate on the ground of fraudulent representation by the seller, it must be established by clear and decisive proof that the alleged representation was made in regard to a material fact; that it was false; that the maker knew that it was not true; that he made it in order to have it acted on by the other party; and that it was so acted upon by the other party to his damage, and in ignorance of its falsity and with a reasonable belief that it was true.

Statements made by the seller of a speculative property like a mine, at the time of the contract of sale, concerning his opinion or judgment as to the probable amount of mineral which it contains, or as to the character of the bottom of the ore chamber, or as to the value of the mine, if they turn out to be untrue, are not necessarily such fraudulent representations as will authorize a court of equity to rescind the contract of sale.

The fact that a representation made by a seller was false raises no presumption that he knew that it was false.

When the purchaser of a property undertakes to make investigations of his own respecting it before concluding the contract of purchase, and the vendor does nothing to prevent his investigation from being as full as he chooses, the purchaser cannot afterwards allege that the vendor made representations respecting the subject investigated which were false.

IN EQUITY. Decree dismissing the bill. Complainant appealed. The case is stated in the opinion of the court.

*Mr. William A. Stewart, Mr. A. T. Britton,* and *Mr. A. B. Browne* for appellant.

*Mr. John H. Miller,* and *Mr. J. P. Langhorne* for appellee.

MR. JUSTICE LAMAR delivered the opinion of the court.

This is a bill in equity to rescind a contract of purchase of a silver mine on the ground of fraudulent representations and to recover the consideration paid.

The suit was commenced originally in the Superior Court of Inyo County, California, on the 8th of May, 1884, but on account of the diverse citizenship of the parties, the plaintiff being a corporation organized under the laws of Nevada, and the defendant a citizen of California, it was removed into the United States Circuit Court. Demurrers to the original bill and to an amended bill having been sustained, the present "second amended" bill of complaint was filed. Answer was filed by defendant, replication by complainant, and issue was joined. Testimony was taken, and the case was heard, resulting in a decree dismissing the bill on the 14th of March, 1887.

It appears from the record that on the 15th of March, 1884, the appellant (who was the complainant below) purchased from

the defendant a mining claim, known as the "Sterling Mine," together with other mining property, all situated in Inyo County, California, paying him therefor the sum of ten thousand dollars.

On the 8th of May, 1884, the original bill of complaint was filed, charging in substance that complainant was induced to purchase said mine and mining property solely upon the representations made by Silva as to its condition, extent, and value; that such representations were made to H. M. Yerington, the president of said complainant company, and to one Forran, a mining expert in his employ, in January, 1884. when an examination of said mine was made by them; that said representations were false and fraudulent, and were well known to the defendant at the time to be such; and that said representations were, in substance and in a somewhat different order, as follows:

(1) That there were 2000 tons of ore in the mine;

(2) That the bottom of what is called the "ore chamber" was solid ore, as good as the ore exposed on the sides of the chamber;

(3) That there were not less than 500 tons of ore in and about the said "ore chamber";

(4) That the mine was worth fifteen thousand dollars; and,

(5) That, after going through the mine, the defendant represented to said Yerington and Forman, that he had shown them all the work which had been done in or about the mine that would throw any light upon the quantity of ore therein.

The answer of the defendant is direct, positive, and unequivocal in its denials of the allegations of the bill, and, as an answer on oath is not waived, unless these denials are disproved by evidence of greater weight than the testimony of one witness, or by that of one witness with corroborating circumstances, the complainant will not be entitled to a decree; and this effect of the defendant's answer is not weakened by the fact that the equity of the complainant's bill is the allegation of fraud. *Vigel* v. *Hopp*, 104 U. S. 441; Story Eq. Jur. § 1528; Daniell Ch. Pr. 844.

The burden of proof is on the complainant; and unless he

brings evidence sufficient to overcome the natural presumption of fair dealing and honesty, a court of equity will not be justified in setting aside a contract on the ground of fraudulent representations. In order to establish a charge of this character the complainant must show by clear and decisive proof —

*First.* That the defendant has made a representation in regard to a material *fact;*

*Secondly.* That such representation is false;

*Thirdly.* That such representation was not actually believed by the defendant, on reasonable grounds, to be true;

*Fourthly.* That it was made with intent that it should be acted on;

*Fifthly.* That it was acted on by complainant to his damage; and,

*Sixthly.* That in so acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true.

The first of the foregoing requisites excludes such statements as consist merely in an expression of opinion or judgment, honestly entertained; and, again, (excepting in peculiar cases,) it excludes statements by the owner and vendor of property in respect to its value.

The evidence in the case shows that in the development of this mine a tunnel, called the "Sterling Tunnel" had first been dug. At a distance of about 140 feet along the line of this tunnel, from its mouth, there are branches running easterly and westerly. About 60 feet from the main tunnel, in the eastern branch, winze No. 1 starts down. About 38 feet below the level of the tunnel, a level known as the "38-feet level" starts off from this winze, and at the bottom of the winze, a distance of about 82 feet vertical below the main tunnel, there is another level known as "82-feet level." In the easterly branch of the tunnel, about 30 feet from winze No. 1, there is another winze starting downward, inclining to the southeast as it goes down. This winze is numbered 2, and is connected with the 38-feet and the 82-feet levels. Intermediate between these levels is another level, known as the "55-feet level," which opens out to the eastward of winze No. 2, into a chamber about 15 feet long and about 8 feet wide. In the southeast corner of this

chamber was a little hole or shaft, extending downward a few feet only. In sinking winze No. 2, Silva struck an ore body at a point opposite the 38-feet level. It was irregular in shape, dipping at an angle of about 45 degrees. Commencing at a point, comparatively speaking, it increased gradually as it descended, and was in form somewhat like a pyramid. At its base it measured 4 or 5 feet across, and it was about 9 feet long. The surface of this inclined pyramid formed the floor or bottom of the chamber. There was, however, a small space between the base and the opposite foot wall, which is called the "bottom" of the chamber by complainant's witnesses, and is the "bottom" spoken of in the bill. The ore comprising this pyramid was carbonate, and being friable, had slacked down over the face of the pyramid to the bottom partially covering it, and partially filling up the little hole or shaft in the southeast corner.

As to the first alleged representation, as classified above — viz., that there were 2000 tons of ore in sight in the mine, and that Yerington relied upon such statement when he made the purchase — the proof utterly fails to establish either that Silva made the statement, as a statement of fact, or that Yerington relied upon such statement even had it been made. Silva, both in his answer and in his testimony, denies ever having made the statement, and the testimony of Yerington himself is to the effect that Silva's statement was qualified by the phrase "in his judgment." This then is shown to have been nothing more than an expression of opinion on the part of Silva as to the quantity of ore in sight in the mine. But even if Silva had made the statement imputed to him in the bill, there is abundant evidence to show that Yerington did not rely upon it in the purchase of the mine. Yerington's own evidence, on this point, is against him. He testifies that he did not believe that there were more than 1000 tons of ore in the mine, and that Forman agreed with him on that point. And he further testifies that, valuing this ore at 32 ounces of ore and 45 per cent of lead per ton, (which it appears was its approximate value as determined by several assays,) and calculating that there would be 1000 tons of ore there, the mine would be worth

ten thousand dollars — the sum he actually gave for it. This lacks much of coming up to the rule that the complainant must have been deceived, and deceived by the person of whom he complains. *Attwood* v. *Small*, 6 Cl. and Finn. 232; *Pasley* v. *Freeman*, 3 T. R. 51. Besides, the quantity of ore "in sight" in a mine, as that term is understood among miners, is at best a mere matter of opinion. It cannot be calculated with mathematical or even with approximate certainty. The opinions of expert miners, on a question of this kind, might reasonably differ quite materially.

In the case of *Tuck* v. *Downing*, 76 Illinois, 71, 94, the court say: "No man, however scientific he may be, could certainly state how a mine, with the most flattering outcrop or blow-out, will finally turn out. It is to be fully tested and worked by men of skill and judgment. Mines are not purchased and sold on a warranty, but on the prospect. 'The sight' determines the purchase. If very flattering, a party is willing to pay largely for the chance. There is no other sensible or known mode of selling this kind of property. It is, in the nature of the thing, utterly speculative, and every one knows the business is of the most fluctuating and hazardous character. How many mines have not sustained the hopes created by their outcrop!"

We approve the position of the court below, that "Yerington and his expert, Forman, were as competent to judge how much ore there was 'in sight' as Silva was. They were no novices in matters of that kind. This misrepresentation, if such it be, does not contain either the 1st, 4th, or 5th element stated by Pomeroy as essential elements in a fraudulent misrepresentation."

As stated above, the substance of the allegation of the bill is, that Silva represented that the bottom of this ore chamber which was covered with loose ore slacked down from the pyramid, was composed of ore as good as that exposed on the sides of the chamber. Silva in his answer expressly denies ever having made such statement. Forman testifies that with a little prospecting pick he had with him, he raked through the dirt and loose ore that had slacked down, to see if it

would reach the bottom of the ore chamber, but that it would not. He further says: "I asked Silva how the bottom was; if he had sunk below there. He said, 'No.' I said, 'How is the bottom? You as a miner know it is a suspicious thing to see a bottom covered up or anything of that kind.' He said the bottom was as good or better than any ore which we saw in the chamber." Yerington at first testifies that Silva, in reply to a question by Forman, stated that this floor was solid ore; but he says that he does not think any comparison was made between that ore and the ore in the sides of the chamber, as narrated by Forman. On the next day, however, Yerington, having, as he says, refreshed his memory, "and I [he] had the means of doing it," was positive that the conversation between Silva and Forman at that time was as Forman afterwards stated it. Silva, in addition to his positive denial in his answer, testifies that "there never was a word said about that. They asked me this, 'What I thought of the ore body?' and I said 'I thought it would be extensive.' I thought so at the time, and I think so yet." The witness, Eddy, who was present all the time in the ore chamber, except when he went to the 38-feet level to get a pick, does not know anything about a conversation such as Yerington and Forman narrate.

On this point, then, the testimony of Silva is directly to the contrary of that of Yerington and Forman. Certain other material facts in the case seem to indicate that there is just as strong probability that Silva's statements in this matter are true, as that those of Yerington and Forman are true. In the bill Yerington alleged, under oath, that Silva had discovered the fact that the *bottom* of the ore chamber was not composed of ore, and had afterwards covered that *bottom* with ore, vein-rock, and matter — in other words, had "*salted*" the mine. There is no evidence in the record to prove this, or tending to prove it. On the contrary, the evidence of Yerington himself, and of the other witnesses who were examined on that point, is all to the effect that the ore covering the floor of the chamber had slacked down from natural causes in fine particles like wheat. Nor is there such evidence to show that Silva knew

the character of this floor, or of the extent of the ore-vein, or *deposit*, (as it afterwards turned out to be,) as would justify the interposition of a court of equity to set aside the contract on the ground of fraudulent representations. He had come on to the ore in excavating from the top. The sides of the ore chamber contained some ore of a good quality, and he had never demonstrated the extent and amount of ore in the pyramidal wedge in the side of the chamber. It is shown by the evidence of Yerington himself, that, in the side of a drift running westerly from the ore chamber, there was ore which appeared to be continuous with the body of ore in the chamber. So that the statement Silva said he made — viz., that he thought the ore body would be extensive — at least, appears reasonable. Upon all the facts and circumstances apparent of record, he might have made the statement he says he made, and believed he was telling the truth. For there is also *some* evidence to the effect that Silva had commenced to run a drift from the bottom of winze No. 1, for the purpose of striking and cutting the supposed downward extension of the ore body in the chamber, and this before the examination of the mine by Yerington and Forman. After the sale of the mine, Coffin, the superintendent for the complainant company, when he commenced work in the mine, started in where Silva had left off in this drift, and carried it immediately beneath the ore chamber, entering the chamber by an up-raise. Then it was that the discovery was made that the ore body, instead of being a continuous ledge or lead, was merely a deposit.

Furthermore, the testimony of Yerington and Forman, as regards the little hole or shaft in the southeast corner of the chamber, is directly opposed by the testimony of Silva and Eddy. Both Yerington and Forman testify that this little shaft was completely filled up with dirt and loose ore; while Silva and Eddy both testify that it was not so filled up, but that both Yerington and Forman stood in that shaft and took samples of ore from it.

It is thus seen that the evidence on this material point does not clearly establish the fraudulent representations of Silva as claimed by the complainant; but that, on the contrary. the

material facts and circumstances as disclosed by the record are entirely compatible with the theory that Silva did not make the representations charged against him, or at most, that he merely gave expression to an opinion as to the extent of the ore body, erroneous though it proved to be. This would not constitute fraud. In the language of the court below: "This testimony was taken in June, 1886, about two and a half years after the conversations took place. They were present at the time examining the mine and engaged in conversation for an hour or more. These discrepancies in matters of detail during a long conversation, related by different parties, viewing the subject from different standpoints after the lapse of so long a period of time, are no more than might reasonably be expected, even in honest witnesses. There is no occasion to impute any intention to testify falsely to either. . . . Parties are extremely liable to misunderstand each other, and, in looking back upon the transaction in the light of subsequent developments, are prone to take the view most advantageous to themselves."

As to the third alleged representation — to wit, that there were not less than 500 tons of ore in and about that ore chamber — Silva, both in his answer and in his testimony, denies that he ever told Yerington and Forman, or anybody else, that there were 500 tons of ore there, or that there was any amount fixed or agreed upon by them as to the quantity of ore there; while the testimony of both Yerington and Forman is to the effect that Silva said *in his opinion,* or *in his judgment,* there were 500 tons of ore in the chamber. So that taking the strongest testimony produced on the part of complainant upon this point, it simply amounts to an expression of opinion on the part of Silva as to the amount of the ore in the chamber, and not a statement of fact. It therefore does not constitute fraud.

It is equally true that any statements that may have been made by Silva with reference to the value of the mine, cannot, under the circumstances of this case, be considered an act of fraud on his part sufficient to warrant a court of equity in setting aside the contract herein. Yerington testifies that Silva

said he had been asking $15,000 for the mine, but that he would take $12,500; while Forman says he does not recollect that Silva made any statement as to the value of the mine, but that he heard Silva say he *thought* it was worth $15,000. Such statements are not fraudulent in law, but are considered merely as *trade talk*, and mere matters of opinion, which is allowable. *Gordon* v. *Butler*, 105 U. S. 553; *Mooney* v. *Miller*, 102 Mass. 217. Moreover, it is clear, beyond question, that Yerington did not purchase the mine upon Silva's representations as to its value, as we shall hereafter see.

This disposes of all the alleged fraudulent representations, as arranged above, except the last, adversely to the complainant, and it is to this one that attention will now be directed. This charge is, substantially, that Silva represented to Yerington and Forman, when they visited the mine in January, 1884, and had gone through it, that he had shown them all the work which had been done in and about the mine that would throw any light on the quantity of ore therein. This representation is alleged to have been false and fraudulent, and well known by Silva to be such, because at a cut a short distance from the mouth of the main tunnel, at a point known as the "point of location," a little hole or shaft had been sunk which had been filled up, and was not observable at the time of the examination of the mine in January, 1884, and also because there had been a number of drill holes made in the sides of the ore chamber, and afterwards filled up before the examination in January, 1884, so that they were not observable at that time, which holes clearly developed the fact that the ore about the chamber was nothing more than a shell instead of a continuous body as it appeared to the observer.

The existence of the plugged-up drill holes in the sides of the ore chamber is the worst feature of the case against Silva. They could not have been made by a former proprietor of the mine, as is slightly claimed in his behalf, for, as has been already shown in this opinion, Silva himself, or at least persons in his employ, had excavated that chamber after he had purchased it from one Edwards in 1876. And certain it is that the drill holes were found plugged up within a short time

after he had sold the mine to the complainant company, March 15, 1884. The question is, did Silva know of their existence at the time he sold the mine, and, having such knowledge, did he falsely represent to the complainant that he knew nothing of them, thereby inducing complainant to act upon such representations? Upon this question the evidence is somewhat conflicting. Yerington testifies that after going through the mine, he asked Silva if he had shown him the whole of the mine, and he replied that he had. And Forman testifies that Silva, in reply to a question from him, said that he had shown him all the work that had been done in and about the mine that would throw any light upon the quantity of ore in the mine, or the extent of the ledge or deposit. Silva admits that, in reply to a question by Yerington, he told him that he had shown him all the work that had been done in and about the mine, either by himself or under his direction. So that the question is narrowed down to simply this: Were said drill holes in existence at the time Silva made such statement; if so, had they been made by him or under his direction, or did he know of their existence? In his sworn answer Silva expressly "denies that he drilled any such hole or holes through the ore into the country rock or otherwise, or thereby or at all discovered the extent of said ore, or that he filled up said drill holes, or concealed them from view or kept them secret from complainant," &c., and in his testimony he also denies having any knowledge of their existence. He says that he drilled no holes in the mine, except what he had to do as a miner, and that he concealed nothing from Yerington when he showed him the mine. And again he says: "I showed Mr. Yerington all the work that was done in the mine that I knew anything of." There is no direct evidence going to show who drilled the holes. And there is nothing in the entire record to connect Silva with them, except the fact that he was the owner of the mine, and was in possession of it at a time when it is most likely they were drilled. But this circumstance alone should not outweigh the positive denial of Silva in his answer, and also his equally positive denial in his testimony, of his knowledge of the existence of said drilled holes. The

law raises no presumption of knowledge of falsity·from the single fact *per se* that the representation was false. There must be something further to establish the defendant's knowledge. *Barnett* v. *Stanton*, 2 Alabama, 181; *McDonald* v. *Trafton*, 15 Maine, 225. This rule is fortified by the consideration that had he known of the limited quantity of ore in and about the "ore chamber," Silva would hardly have gone to the expense and labor of starting a drift from the bottom of winze No. 1, and constructing it for a certain distance, before the sale of the mine, for the purpose of reaching the supposed downward extension of the ore in and about that chamber. Knowing that the ore body terminated within a few inches of the surface of the chamber, and then in the face of that knowledge actually constructing a drift on the 82-feet level, at enormous expense, for the purpose of getting under that limited quantity of ore, would not appear a reasonable thing to do by any one, especially by such an experienced and practical miner as Silva is admitted to have been.

The testimony, therefore, and all the other facts and circumstances of record, do not substantiate complainant's theory of the case on this point; in other words, there is not a satisfactory case of fraudulent representations on this point made out — not such a case as would justify the interposition of a court of equity to set aside the contract under consideration on the ground of fraudulent representations.

As regards the little hole or shaft that had been sunk at the "point of location" and afterwards filled up, so that it was not . servable at the time of Yerington's visit in January, 1884, there is absolutely no testimony at all to show that Silva knew anything about its existence. He had done no work at that place, or very little at most, and was using the cut there as a sort of kitchen. The sides of the cut indicated that there was a ledge of ore there. It is admitted that Forman asked Silva why he did not "go down" on that ore, and that he replied that he considered the tunnel the best place to mine.

Silva denies, both in his answer and in his testimony, that he ever knew that a shaft had been sunk at the point of location, and no one is found who can testify that he did know

anything about it. On the contrary, the former owner of the mine, one Edwards, testifies that he himself dug that shaft and filled it up prior to the time Silva purchased it, and that to his knowledge Silva did not know anything about that shaft.

It is essential that the defendant's representations should have been acted on by complainant, to his injury. Where the purchaser undertakes to make investigations of his own, and the vendor does nothing to prevent his investigation from being as full as he chooses to make it, the purchaser cannot afterwards allege that the vendor made misrepresentations. *Attwood* v. *Small, supra; Jennings* v. *Broughton,* 5 De Gex, Macnaghten and Gordon, 126; *Tuck* v. *Downing, supra.*

The evidence abundantly shows that Yerington had been willing to give $10,000 for the mine prior to the time he visited it and made his examination in January, 1884. He had made inquiries of various persons for months previous to that visit. Several experts in his employ had visited the mine, had taken samples of ore from it, and it must have been from reports thus received that Yerington had made up his mind as to what the mine was worth. From the letters of an agent (Woods) to Eddy, the testimony of the witness Boland, the testimony of the witness Anthony, Eddy's testimony, and from the testimony of Silva himself, there can be no doubt that Yerington had offered $10,000 for the mine several months before he had ever seen it. Thus showing that his examination of the mine in January, 1884, merely went to corroborate the reports that he had received of it from his experts, Forman, Bliss; and that it was upon such reports, and his own judgment after an examination of the mine, that he made the purchase of it.

From all which it is clear to this court that the complainant has not proven his case, and the decree below is

*Affirmed.*