Argued April 24, affirmed May 15, rehearing denied June 26, 1917.

# MARMENI *v.* BELLARTS.*

(164 Pac. 955; 165 Pac. 1170.)

**Vendor and Purchaser—Rescission—Sufficiency of Evidence.**

1. Testimony of plaintiff purchaser and another that the vendor misrepresented a boundary line does not warrant a rescission, where the abstract, deeds and maps correctly describing the property were examined by the plaintiff's agents, especially where plaintiff seeks to rescind after the property has decreased in value.

[As to effect of failure to read contract or carelessness in executing it or right to rescind for fraud, see note in 32 **Am. St. Rep.** 384–387.]

From Multnomah: Harry H. Belt, Judge.

Suit by Eugene Marmeni against Henry J. Bellarts to rescind a sale of certain real property and praying for other equitable relief. The defendant obtained the decree in the lower court and plaintiff appeals. Affirmed.

Department 1. Statement by Mr. Justice Harris.

This is a suit to rescind a sale of real property, to cancel a mortgage and note and to recover the payments made on the purchase price. H. J. Bellarts owned land in the city of Portland upon which was located a large ten-room dwelling-house. The premises are described thus: Lot 6 in Block 4 in Beacon Heights and also a strip 30 feet in width along the east end of lot 6. Bellarts conveyed by warranty deed lot 6 and the 30-foot strip along the east end of the lot "all according to the duly recorded map and plat thereof as the same appears of record in said Multnomah County, Oregon," to Eugene Marmeni on

---

*On right to rely upon representations made to effec' contract as a basis for a charge of fraud, see note in 37 **L. R. A.** 610.

On right of purchaser of land to rely on representation of seller as to boundaries, see note in 14 **L. R. A. (N. S.)** 1210.          Reporter.

March 15, 1912, for the agreed price of $3,750, of which $600 was paid in cash, and Marmeni paid the remainder of the purchase price by giving his promissory note for $3,150, and a mortgage on the realty as security.   The principal sum of the note with interest was made payable in monthly installments of not less than $25 commencing with April 15, 1912.   Marmeni at once took possession, rented the premises and received the rents.   He paid the monthly installments on the note until and including the month of June in 1914.   In August, 1914, Marmeni tendered a deed together with the rentals collected by him and demanded that Bellarts cancel the note and mortgage and return the payments made by him.   Upon the refusal of Bellarts to comply with the demand, Marmeni commenced this suit to rescind the sale, on the ground that he had been induced to purchase by misrepresentations concerning the location of the boundaries of the premises. The defendant denied the charge of fraud, alleged an affirmative defense and also prayed for a foreclosure of the mortgage.   The decree of the trial court was for the defendant and the plaintiffs appealed.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Henry M. Kimball.*

For respondent there was a brief over the name of *Messrs. Malarkey, Seabrook & Dibble,* with an oral argument by *Mr. Ephraim B. Seabrook.*

MR. JUSTICE HARRIS delivered the opinion of the court.

1. We can have a better understanding of the situation if we first describe the premises.   Bellarts owned lot 6 together with a 30-foot strip on the east end of the

lot. Lot 6 faces Ninth Street on the west with a frontage of 45 feet and it is 51.8 feet in depth. Adding the 30-foot strip to lot 6 it will be seen that the premises owned by Bellarts were 45 feet in width by 81.8 feet in length. Adjoining the east end of the premises owned by Bellarts is a second 30-foot strip which has been made prominent by this litigation. For convenience the first 30-foot strip or in other words the one adjoining lot 6 will be referred to as A and the other 30-foot strip will be designated as B. An iron fence extended across the front end of lot 6. A board fence extended along the south side of lot 6, A and B and the same kind of a fence was maintained along the north line of lot 6, A and B; and a similar fence was constructed along the east line of B. In brief, if we consider lot 6, A and B as a single tract they were inclosed with an iron fence on the west, and with a board fence along the north and south sides and on the east end. While the evidence is conflicting, it fairly appears that a fence made of wire netting was maintained on the line between A and B. The dwelling-house covers nearly all of lot 6 and A, as it is only about eight or ten feet from the front of the building to the street and it is about the same distance from the rear of the house to the east line of A.

The persons to be kept in mind are H. J. Bellarts, the vendor, Eugene Marmeni, the vendee, Louis Deluchi, a real estate agent, and M. G. Montrezza, who was admitted to practice as an attorney at law in June, 1912.

Marmeni had "a little money" in 1912 and as he expressed it "I thought I better buy a little piece of property before I spend the money." Montrezza was advised by his client Marmeni that the latter "wanted to purchase a house somewhere" and the former then

asked Deluchi "if he had anything to submit." De-
luchi afterwards took Montrezza and Marmeni and
showed them the property on March 12, 1912. Deluchi
had previously seen Bellarts and arranged for a
broker's commission in the event he found a purchaser
for the property. Deluchi avers that Bellarts told him
that his property included all within the board fence;
but Bellarts denies this and says that he did not tell
Deluchi anything about the dimensions except that he
owned lot 6 and a 30-foot strip. Marmeni testified
that when looking over the premises Deluchi told him
that the property he was to buy included all the land
within the board fence and Deluchi testified to the
same effect. After inspecting the property Marmeni,
Deluchi and Montrezza immediately went to Bellarts,
and after some conversation Marmeni agreed to pur-
chase the property, paid Bellarts $40 to bind the
bargain and took a receipt which recited the payment
of the deposit and that Marmeni was to have an oppor-
tunity to examine the abstract. The receipt was not
produced; but, Montrezza testified that he prepared
the receipt; and he also stated that because of the fact
that he had not yet been admitted to practice as an
attorney at law he was especially careful to see that
it contained a correct description of the property.
Bellarts produced and delivered an abstract together
with three deeds, one from Sarah Calvet to Otto
Myhre, one from the guardian of the estate of Myhre
to Bellarts, and one from Myhre to Bellarts. Not
wishing to assume the responsibility of examining the
title, Montrezza delivered the abstract to Samuel
Olson, an attorney, who examined the abstract and
gave a written opinion on March 15, 1912, to the effect
that Bellarts owned the property in fee simple. The
sale was closed on March 15, 1912, when Marmeni,

Montrezza, Deluchi and Bellarts went to the office of
J. A. Strowbridge for the purpose of signing and pass-
ing the necessary papers. Marmeni paid Bellarts
$560 which with the $40 deposit made a total payment
of $600. Bellarts delivered a warranty deed to Mar-
meni and the latter delivered his note and mortgage
to the former. Before the deed and mortgage were
delivered Montrezza examined them for the purpose
of ascertaining whether they were properly drawn and
more especially to see whether the description cor-
responded with the description in the abstract.

The description in the deed to Marmeni is in exact
conformity with the description found in the abstract
and three deeds which were delivered with it and also
with the description found in the written opinion by
Olson concerning the title. The first page of the ab-
stract reads thus: "Lot 6 Block 4, Beacon Heights,
also a strip of land 30 feet wide along the east side of
said lot 6." The second page contains a map of lot 6
and the other lots in the block facing Ninth Street.
The map plainly shows that the width of lot 6 is 45
feet and that its length is 51.8 feet.

While the liability of Bellarts does not necessarily
depend upon whether he showed the premises to
Deluchi or upon whether he told Deluchi that he owned
all the property within the board fence, nevertheless
the testimony concerning those matters may be helpful
in determining the credibility of the witnesses. The
testimony of Deluchi concerning a woman cleaning the
house, together with what Mrs. Bellarts says about
cleaning the house rather indicates that Bellarts never
accompanied Deluchi to the premises. Bellarts knew
that he owned lot 6 and A and he also knew that the
deeds under which he claimed title did not embrace
B. Bellarts had the abstract and it is to be presumed

that he knew that the map showed that lot 6 was 51.8 feet long and that he therefore knew that 81.8 feet was the depth of his property.  Being aware of all of this, it would be quite extraordinary for Bellarts to represent that he owned all within the board fence and then deliver the abstract and three deeds for inspection knowing that the abstract plainly showed the dimensions of the premises owned by him.  One cannot read the transcript without being impressed with the idea that Deluchi is decidedly friendly to Marmeni and yet it is a most significant circumstance that Deluchi admitted that when they inspected the premises the board fence along the east end of B appeared to be more than 100 feet from the street.  When a witness for the plaintiff and asked: ''How far did it look from the front fence to the back fence?'' he answered: ''Fully over a hundred feet.''  And in response to the next question: ''Anybody could see that, the same as you?'' he answered ''Sure.''  It will be recalled that Montrezza prepared the receipt for the $40 deposit and that he was careful to insert the description in the receipt.  Montrezza knew what Marmeni was buying and so did Olson.  Both Montrezza and Olson were agents for Marmeni and their knowledge was his knowledge.  Olson knew the length of the property to be purchased because the map in the abstract told him the dimensions and it is fair to assume that Montrezza likewise knew the depth and width of lot 6 and A.

The subsequent conduct of Marmeni throws additional light upon the contention he now makes.  On July 22 or 23, 1913, Deluchi received a letter from J. Landigan giving notice that the latter held a warranty deed to B and complaining because B was fenced in.  Deluchi immediately notified Marmeni of the re-

ceipt of this letter and the latter in turn consulted with Montrezza. It is true that Marmeni excuses his subsequent conduct by the claim that his suspicions were quieted and his mind lulled to rest by certain representations made by Bellarts, but it is also true that this claim of Marmeni is flatly denied by Bellarts; and, moreover, Marmeni paid the taxes on July 24, 1913, after being told of the Landigan letter received by Deluchi. Marmeni continued to pay the monthly installments on the note and he collected the rents until finally on June 24 or 25, 1914, Marmeni received from Landigan a letter dated June 3, 1914, notifying Marmeni "to take down your fence and improvements on my ground east of 614 East 9th." Soon after the receipt of this letter Marmeni consulted an attorney and subsequently demanded that Bellarts rescind the sale.

It would not be difficult to imagine a variety of situations where a vendee would be entitled to rely upon representations by the vendor or his agent concerning the location of a boundary line; and because of such reliance, upon ascertaining the falsity of the representations, he could rescind the sale. However, at the very outset of the present investigation we find the contention of plaintiff clouded with suspicion. In 1912 property values were elevated. When Marmeni purchased there was talk of the construction of a bridge which would have materially benefited the property, but at the fall election the proposal to build the bridge was defeated. With the year 1914 came financial depression and marked reductions in realty values. The property was amply worth the price in 1912 but it was not worth the price in 1914.

If Marmeni was deceived at all it was only because of what Deluchi claims he told him about the board

fence. Marmeni insists that there was no wire fence on the line between A and B, although he concedes that a wire fence ran across one corner. It will be recalled that Montrezza prepared the receipt that was given by Bellarts to Marmeni when the $40 deposit was made. According to the testimony of the plaintiff himself "Mr. Montrezza drew that up, before we went to Mr. Bellarts." Having prepared the receipt before they saw Bellarts it is obvious that Montrezza had gone to the trouble of ascertaining the description of the land owned by Bellarts before they inspected the premises, because it is conceded that Montrezza, Marmeni and Deluchi went to Bellarts immediately upon completing their examination of the property. Montrezza explained that he took unusual care to obtain the correct description because he had not yet been admitted to practice and naturally he wished to avoid any possibility of making any mistake. Deluchi tells us that it appeared to be more than a hundred feet from the front fence to the board fence on the east end of B and that "anybody could see that." The map, abstract and deeds all showed that the land owned by Bellarts was 81.8 feet and not 111.8 in depth. Olson examined the abstract and presumably ascertained the depth of the property owned by Bellarts. Marmeni relied upon Montrezza not only for legal but also for business advice. Montrezza was paid by Marmeni "for looking over the premises"; and Montrezza advised Marmeni to take the deed because the former thought that the latter "would be getting what he bought." In contemplation of law Marmeni knew what his agents Olson and Montrezza knew and their knowledge that the property owned by Bellarts was only 81.8 feet in length must be imputed to him. Marmeni could not remain blind to

what he saw with his own eyes. His witness Deluchi says that anybody could see that the board fence on the east end of B was more than 100 feet from the front of lot 6 and consequently Marmeni is in no position to claim that he was induced to buy because of a misrepresentation of a boundary line, when "anybody could see" that the line claimed to have been shown would give the property a depth of more than a hundred feet and he must have known that the land deeded to him was only 81.8 feet in depth: *Waymire v. Shipley,* 52 Or. 464, 473 (97 Pac. 807); *Southern Development Co.* v. *Silva,* 125 U. S. 247 (31 L. Ed. 678, 8 Sup. Ct. 881); *Shappirio* v. *Goldberg,* 192 U. S. 232 (48 L. Ed. 419, 24 Sup. Ct. 259); *New Orleans etc. Min. Co.* v. *Musgrove,* 90 Ala. 428 (7 South. 747); 2 Pom. Eq. Jur. (3d ed.), 892. If a vendee knows that he is buying a strip of land 81.8 feet long he cannot successfully claim that he has been defrauded if he is shown a line which he knows would make the strip more than 100 feet long. The evidence does not warrant a rescission and the decree is therefore affirmed.

AFFIRMED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BENSON and MR. JUSTICE BURNETT concur.

Affirmed May 15, rehearing denied June 26, 1917.

ON PETITION FOR REHEARING.

(165 Pac. 1170.)

On petition for rehearing.    Rehearing denied.

*Mr. Henry M. Kimball,* for the petition.

*Messrs. Malarkey, Seabrook & Dibble, contra.*

Department 1.    MR. JUSTICE BENSON delivered the opinion of the court.

In support of his motion for rehearing, counsel for appellant urges that the former opinion herein must have been hasty and ill-considered by reason of the fact that the opinion discusses certain allegations of the affirmative answer in regard to which there is no evidence in the record.    By some inadvertence, it is true that the writer of the former opinion did refer to such portion of the answer upon the theory that it was not denied in the reply, and this is error.    However, we have again read the testimony line by line, considering every suggestion made by counsel, and are unable to discover any good reason for changing the conclusion reached in the former opinion.    The rehearing is therefore denied.    REHEARING DENIED.

MR. CHIEF JUSTICE MCBRIDE and MR. JUSTICE BURNETT concur.

MR. JUSTICE HARRIS delivered the following concurring opinion:

1. The plaintiff earnestly insists that the conclusions expressed in the original opinion are not sustained by

the evidence and that a rehearing should be granted. In the original opinion it is stated that:

"In 1912 property values were elevated. When Marmeni purchased there was talk of the construction of a bridge which would have materially benefited the property, but at the fall election the proposal to build the bridge was defeated. With the year 1914 came financial depression and marked reductions in realty values. The property was amply worth the price in 1912, but it was not worth the price in 1914."

When checking over the pleadings, as printed in the abstract of record, paragraphs XI and XII of the answer and cross-complaint were treated as admitted by reason of the supposed failure of the plaintiff to deny them, but a re-examination of the abstract discloses that those two paragraphs were denied; and hence the quoted statements are not fully justified by the record, although the subject of the bridge and the decrease in realty values received more than passing notice at the time of the hearing. While there was no evidence concerning the bridge, for the reason that the court sustained an objection to an offer of the defendant to show the facts regarding the bridge, nevertheless, there was enough evidence to warrant the inference that the property was worth the purchase price in 1912. Deluchi, who was "in the real estate business," said that at first Bellarts asked $4,000 for the property, but he consented to sell for $3,750. Deluchi considered the selling price was the fair value of the land, for in the language of his testimony: "I thought that was a fair purchase price, I told Mr. Bellarts, you know a real estate man tries to compromise, that is, wants to do the fair thing for both." However, it is not essential, and perhaps not even important, to know the difference between the values in 1912 and in

1914, although evidence of a material reduction in value, if competent at all, might tend to throw light upon the motives actuating Marmeni. In some jurisdictions the courts have taken judicial notice of a general depression in values of real estate: 7 Ency. of Ev. 934; but we shall assume, without deciding, that by reason of the language in Section 729, L. O. L., courts cannot take judicial notice of a general financial depression; and, therefore, not only what was said in the original opinion about the bridge but also what was said concerning the value of the premises in 1914, as well as all of the discussion about the bridge and values at the time of the hearing, will be laid out of the case.

Deluchi received a letter from J. Landigan on July 22 or 23, 1913. Deluchi immediately informed Marmeni of the letter and while the original opinion is not accurate in declaring that Marmeni "consulted with Montrezza" about this letter, it is nevertheless accurate to say that Montrezza was notified of the claim made in the Landigan letter, for according to the testimony of Montrezza "Mr. Deluchi brought it to my attention himself."

The petition for a rehearing questions the correctness of the statements made in the original opinion about the preparation of the $40 receipt. Montrezza had not yet been admitted to practice as an attorney at law when Marmeni purchased the property, and, on that account, Montrezza was unusually painstaking. He explained that he was very careful when examining the papers in Strowbridge's office and he said that he was likewise careful in the preparation of the receipt, for he testified thus:

"I remember being naturally, you may say, waiting to be an attorney, and as an attorney to be at the time, I was careful what I was doing, as I had quite a large Italian practice at the time, before I was admitted."

The plaintiff urges that Montrezza inserted the description of the property in the receipt at the time of the payment of the $40. The description may have been written in the receipt at the time Bellarts signed it; and, yet, the fact remains that Marmeni testified that "Mr. Montrezza drew that up, before we went to Mr. Bellarts." No witness testified that the description was inserted after Marmeni, Deluchi and Montrezza visited the premises. The receipt was not produced; but the evidence overwhelmingly shows that the receipt mentioned the premises. Montrezza testified thus:

"I don't remember whether I had the number of the lot or block, or the dimensions, or location of the property."

Whether Montrezza obtained the description or dimensions of the property before or at the time Bellarts signed the receipt is not material because the ultimate fact is that he had "something connected with the dimensions, or location of the property." While Montrezza testified that "Mr. Marmeni paid me something for looking over the premises," and Marmeni swore that "I didn't pay him anything"; nevertheless, Marmeni is confronted with the indisputable facts that Montrezza prepared the receipt, was present when Bellarts signed it, was also present when the final papers were signed and passed, and was acting for and in behalf of Marmeni. Montrezza knew what property was being sold because he wrote the receipt. Montrezza was the agent of Marmeni and his knowledge was the knowledge of Marmeni.

When a witness for the plaintiff, Deluchi said that while he did not measure the distance from "the front to the back, between the two fences" he was "positive it was over a hundred"; but that it appeared "fully

over a hundred feet'' and that ''anybody could see that.'' In his printed brief Marmeni says that he ''examined the premises and observed the boundaries but did not appreciate the distance.'' If Marmeni is to be judged by his own evidence it will become reasonably certain that he has at least a fair idea of measurements and distances. When asked about his estimate of the dimensions of the house and after protesting that ''I am a poor judge about that'' he said that the house ''must be more than forty-five by fifty; must be about forty-five by sixty, something like that; I am just guessing.''

If Bellarts is liable at all it is because of what Marmeni says that Deluchi told him. It is true that Marmeni testified that Bellarts told him when the receipt was signed that ''everything Deluchi showed me inside the fence was all mine,'' but it is also true that Bellarts denied this, and, although present on the occasion mentioned, neither Montrezza nor Deluchi undertook to corroborate Marmeni.

While Bellarts is responsible for whatever Deluchi said, by the same token Marmeni is chargeable with whatever he himself knew and also with whatever Montrezza learned when acting as his agent. When speaking of the knowledge with which Marmeni was chargeable, the circuit judge who saw the witnesses and heard them testify remarked that

''a man who was so diligent as Mr. Marmeni in accumulating money in his business with which to buy property, it seems to me he would ascertain how many feet there were in the lot. I believe that Marmeni knew the dimensions of that lot after the examination of the abstract, because an attorney could not help by the reading of the abstract know that the lot was 45 feet frontage and 81.8 feet deep, that is the property which he was buying.''

The evidence shows that Marmeni knew or must be deemed to have known that it was more than 100 feet from the front fence to the rear fence which, he says, was pointed out to him as the boundary of the premises; he knew or must be deemed to have known that the property described in the receipt and deed delivered to him and in the mortgage signed by him was only 81.8 feet in length; and consequently he is in no position to claim that he was defrauded, especially after the long delay which followed the Landigan letter in 1913. The transcript of the testimony was read twice before the preparation of the original opinion and a third reading has only confirmed the conclusion there expressed. A petition for a rehearing should be denied.