### FORD MOTOR CO. v. DEXTER et al.

District Court, S. D. New York.

June 24, 1931.

Greene & Hurd, of New York City (George F. Hurd, Edward E. Weadock, and James L. Dohr, all of New York City, of counsel), for plaintiff.

Root, Clark & Buckner, of New York City (Emory R. Buckner and I. Bernard Halpern, both of New York City, of counsel), for defendants.

WOOLSEY, District Judge.

I shall direct a verdict for the plaintiff in this case on the second and third causes of action contained in the complaint and for the defendants on the fourth and fifth causes of action.

I understand that in the first cause of action a settlement has been agreed on at a certain figure.

I. On November 1, 1922, the defendants were the owners of all the capital stock of a coal company known as the Dexcar Pocahontas Coal Company, and on that day a representative of the plaintiff, in pursuance of negotiations which had lasted for some three weeks prior thereto, made and signed an agreement for the purchase of the stock of the Dexcar Pocahontas Coal Company, hereinafter called Dexcar, in the following form:

"Agreement between Ford Motor Company, party of the first part, and George M. Dexter and William H. Carpenter, parties of the second part.

"The party of the first part agrees to exchange the shares of stock enumerated on the annexed list for thirty-five hundred (3500) shares of the capital stock of the Dexcar Pocahontas Coal Company, formerly known as the J. B. B. Coal Company, on or before the 15th day of November, 1922, and the parties of the second part agree that they will forthwith deposit with the Battery Park National Bank certificates properly endorsed in blank for said thirty-five hundred (3500) shares of the Dexcar Pocahontas Coal Company, and the party of the first part

agrees that it will on or before said 15th day of November, 1922, deposit with the said Battery Park National Bank certificates endorsed in blank, under the rules of the New York Stock Exchange, for the shares of stock set forth in Schedule 'A' herewith annexed, and the parties hereto mutually authorize the said Battery Park National Bank to deliver the shares of stock of the Dexcar Pocahontas Coal Company to the party of the first part, and the stock enumerated on the annexed list (Exhibit 'A') to the parties of the second part.

"The parties of the second part agree to indemnify and hold harmless the party of the first part from any loss or injury which it may sustain by reason of the existence of any claim presented against the Dexcar Pocahontas Coal Company within six months from November 1st, 1922, for any liabilities arising because of mine accidents, torts or contracts which do not appear on the books of said Company on October 31st, 1922, and which are not for current merchandise, supplies and labor; and except contract and sales set forth on Exhibit 'B' hereto attached.

"Dated—Nov. 1st, 1922

"Ford Motor Co.  W. B. Mayo
"George M. Dexter
"W. H. Carpenter"

On the next day the same parties made and signed a supplementary agreement which was in the form of a letter and which reads as follows:

"New York City, November 2nd, 1922
"Ford Motor Company, Detroit, Mich.

"Gentlemen: Attention: Mr. W. B. Mayo. It is understood between us that the price is $1,250,000.00 for our physical assets and leaseholds at Twin Branch, West Virginia, that we are to assume the payment of the outstanding bonds amounting to $40,-000.00, which amount we will deduct from your price of $1,250,000.00 and you assume the payment thereof, leaving a net balance of $1,210,000.00.

"The inventory supplies and store merchandise has been fixed at $90,000.00, which, added to the $1,210,000.00, makes a total of $1,300,000.00 for all the physical assets and leaseholds and the store and mine supplies; the Ford Motor Company to pay the bonds.

"In addition to the above, the net current assets, as of October 31st, 1922, were fixed at $100,000.00, which added to the amount of $1,300,000.00, makes a sum of $1,400,000.00, and it is understood and agreed that if the net current assets do not equal $100,000.00,

as shown on attached statement, we are to refund to you any such difference, and in the event of the net current assets totaling more than $100,000.00 the Ford Motor Company will pay to us such difference.

"Attached hereto is a balance sheet as of October 1st, 1922, which we believe to be substantially correct.

"Yours very truly,
"Geo. M. Dexter
"W. H. Carpenter
"Ford Motor Co.  W. B. Mayo"

To this letter there was annexed a balance sheet of Dexcar as of September 30, 1922.

The purpose of these agreements was to arrange an exchange of securities which would prevent the incidence of any capital profits tax on the defendants, but to leave open for future adjustment the question whether any cash had to be paid by either party to the other in order to arrive at the exact amount intended by the parties as the purchase price under their transaction.

II. Subsequent thereto, the Treasury assessed against Dexcar for the year 1920 additional excess profits and income taxes which, with interest, totaled $37,088.81, and for the year 1921 additional excess profits and income taxes which, with interest, totaled $129,583.05.

These additional assessments involved a challenge by the Treasury of the income tax returns filed by Dexcar on March 15, 1921, and March 15, 1922, respectively, when it was owned by the defendants.

When these returns were thus challenged, the exchange of securities referred to in the contracts had taken place, and the Ford Motor Company was the owner of the Dexcar stock.

III. The controversy involved in this interesting and unusual case centers about the meaning of the supplementary contract of November 2, 1922, embodied in the letter from the defendants to the Ford Motor Company above set forth.

That contract provides that "it is understood and agreed that if the net current assets do not equal $100,000.00, as shown on attached statement, we are to refund to you any such difference, and in the event of the net current assets totalling more than $100,-000.00, the Ford Motor Company will pay to us such difference."

Net current assets obviously are found by deducting current liabilities from current assets.

I think that, whether the defendants were aware that there might be some additional tax liability, although they did not know the amount thereof, or whether they were not aware that there was any additional tax liability, the tax liability subsequently imposed by the government was a current liability at the time of the contracts of November 1 and 2, 1922.

This is evidenced practically by the fact that the government assessed interest from the respective tax dates in addition to the amount of the tax.

The only possible theory on which interest could have been assessed, of course, was that the money was due on the respective tax dates and had been withheld by Dexcar until the assessment. For the theory of interest is that it is damages for failure to pay money when due.

If authority in regard to this principle be needed in connection with an income tax situation, the case of Union Pacific R. R. Co. v. Bowers (D. C.) 21 F.(2d) 856, 857, affirmed (C. C. A.) 24 F.(2d) 788, affords it.

The situation was well summarized by Judge Goddard in 21 F.(2d) 856, at page 857, where he said: "I do not think that the contention urged by plaintiff is in accordance with the intention of those who drew or passed the statute, or with a fair construction of it, and, of course, the result urged by plaintiff would place in a favored group those who delayed filing accurate returns, and permit them to file a correct return and pay their tax any time prior to the time the bureau could reach the return for audit, and, if the plaintiff's counsel are correct in their contention, whether the filing of the proper return or payment of tax was intentionally delayed would make no difference. Clearly, it seems to me that the 'deficiency' came into existence on March 15, 1922, for it was then that the short payment or deficiency arose. No change in respect to the legal status of the obligation to pay the full tax occurred between that date and the date upon which it was paid. The obligation to pay is not, under the statute, made contingent upon the examination of the return by the Commissioner."

The same principle seems to have been recognized by the Circuit Court of Appeals for the Fifth Circuit in United States v. Russell, 22 F.(2d) 249, 251, reversed on other grounds 278 U. S. 181, 49 S. Ct. 121, 73 L. Ed. 255; and also United States v. Lam (D. C.) 26 F.(2d) 830, 831; Riverside & Dan

River Cotton Mills, Inc., v. United States (Ct. Cl.) 37 F.(2d) 965, 969. See, also, in connection with the date of accrual of a tax, United States v. Anderson, 269 U. S. 422, 440, 441, 46 S. Ct. 131, 70 L. Ed. 347.

The excess profits and income taxes for 1920 and 1921, though subsequently assessed against Dexcar, were therefore due and payable at the time the contracts of November 1 and 2, 1922, were entered into between the parties.

An agreement such as that contained in the letter of November 2, 1922, with regard to the adjustment of net current assets necessarily looks to the future and its operation has to be determined by subsequent events. It necessarily would cover unknown current liabilities as well as those which might be suspected or might be known.

IV. The parties hereto have throughout evidenced perfect fairness in connection with those subsequently assessed taxes; they joined in an effort to reduce them and succeeded in part in doing so; when paid by the plaintiff, they were paid without prejudice to the plaintiff's rights, if any, under the contract above set forth.

The only question, therefore, here open, is the question of whether these tax liabilities fall under the provisions dealing with net current assets in the contract of November 2d.

I think that they necessarily do and that they decreased the net current assets of Dexcar well beyond the vanishing point.

If the parties cannot agree on the amount for which judgment is to be entered hereunder, they will have an opportunity, when the case is called again for trial, of making proofs in regard thereto.

V. On the fourth and fifth causes of action, which sound in fraud, I think that the plaintiff must fail.

In such a cause of action the plaintiff must prove a representation, the falsity thereof, a scienter, the fact that he was deceived, and his resulting injury. Southern Development Co. v. Silva, 125 U. S. 247, 250, 8 S. Ct. 881, 31 L. Ed. 678; Ochs v. Woods, 221 N. Y. 335, 338, 117 N. E. 305; Reno v. Bull, 226 N. Y. 546, 550, 124 N. E. 144.

A verdict must go for the defendants on these two causes of action because the plaintiff has failed to show scienter on the defendants' part by a preponderance of the evidence.

VI. The trial in this case was suspended on February 2, 1931, and it was then agreed

that the case might proceed at such a later date as might be fixed by the court, with a jury of one, who was then sworn.

The case will be continued on Tuesday, June 30, 1931, at 10 o'clock a. m. and a verdict will be directed for the plaintiff in accordance with the above at that time on the second and third causes of action for such amount as may be agreed by the parties, or then shown by the proofs to be due; and for the defendants on the fourth and fifth alleged causes of action.