706

## SAUNDERS v. BRANHAM et al.
### No. 6525.

United States Court of Appeals for the District of Columbia.

Decided March 30, 1936.

Lowry N. Coe, of Washington, D. C., for appellant.

Carl A. Marshall, Raymond M. Hudson, and Minor Hudson, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, GRONER, and STEPHENS, Associate Justices.

ROBB, Associate Justice.

Appeal from a decree in the Supreme Court of the District dismissing plaintiff's (appellant's) bill to rescind contracts for the purchase of shore lots on Chesapeake Bay alleged to have been obtained through fraudulent representations of defendants (appellees), and seeking to recover money paid thereunder by plaintiff.

The bill alleged that in April, 1932, plaintiff entered into a contract to purchase four lots in Anne Arundel county, Md., at North Selby on Chesapeake Bay from the defendants, trading as "Selby on the Bay Properties Company"; that as an inducement to purchase defendants "falsely and fraudulently" represented to the plaintiff that the defendants "would thereupon, during the summer of 1932, resell the said lots, at a profit to the plaintiff of not less than $100 per lot   *   *   *"; that although the contract provided for deferred payments of $25 monthly, the defendants represented and agreed that plaintiff would not be required to make any deferred payments.

That in September, 1932, plaintiff received notice from defendants to pay the deferred monthly installments of $25; that plaintiff protested, and defendant Branham informed plaintiff that because defendants "were going to sell one of the lots within a short time and would apply the proceeds to deferred payments" she would not be obliged to make the deferred payments; that defendant Branham thereupon reiterated the representation that the defendants would resell the lots, and thereby induced the plaintiff to sign a new contract for the purchase of two of the lots covered in the April contract, giving plaintiff credit for the payment made on the April contract and providing for deferred payments of $10 monthly; that defendant Branham informed plaintiff she would not have to make deferred payments under the September contract, but that the lots would be resold and "that the plaintiff would receive a profit of at least One Hundred Dollars ($100.00) on each lot"; plaintiff further alleging that these representations "were false"; that defendants made no effort to resell.

Defendants answered, among other things, denying the alleged fraudulent representations.

Plaintiff, a sales clerk in a local department store, who had no business experience, testified substantially as follows: That in April, 1932, an old friend, Mrs. Evans, telephoned plaintiff that if she would go down to Selby on the Bay to a luncheon and lecture, Mrs. Evans would receive $1 for sending her, and plaintiff agreed to go. (Mrs. Evans was employed as a solicitor by defendants Branham and Williams "operating as the Selby on the Bay Company.") Thereafter one of the defendants' salesmen (Looper) conveyed plaintiff to Selby, a real estate development near Annapolis on Chesapeake Bay. Defendant Branham there made representations to plaintiff and others as to the value of the lots as an investment. Plaintiff became enthused and "thought there was a good chance to make some money." The salesman showed her lot 144 and "represented that if Mrs. Saunders would buy they would resell that summer for a profit of at least $100.00." "She had been told that Mr. Looper [the salesman] was trustworthy, and she put confidence in him."

As a result of his representations, plaintiff on April 5, 1932, signed a contract for the purchase of lot 144 for $725, making a cash payment of $217.50, the balance to be in deferred monthly payments of $10.

The following week Looper took the plaintiff "down again." Another of defendants' salesmen (Eppling) showed her three lots adjoining lot 144, "and told her if she would buy those additional three lots that they would divide them into five lots and sell each one at a profit of at least $100.00; that they could sell at least a couple of them by the end of the summer at a good profit, and not less than $100.00 on each." Relying on these representations plaintiff on April 14, 1932, signed a second contract for the purchase of lots 142, 143, and 145, for a total of $2,100, making a cash payment of $630 and agreeing to pay the balance monthly at $15. Plaintiff knew that the contracts provided for monthly payments, but had been told that it would not be necessary to make deferred payments as they would be taken care of out of the resale price of the lots. Plaintiff visited the development at Selby about seven times during the summer of 1932. "The defendants made no efforts to sell her [plaintiff's] lots." She had seen defendant Branham a number of times during the summer, "on each of which occasions he told her that he was going to sell her lots." During the summer of 1932 she (plaintiff) "became suspicious that they were not going to resell; that she knew they were not."

In September, 1932, plaintiff "went in to see Mr. Branham [defendant]" because "she had received notices that payments of $10.00 and $15.00 monthly were due on her contracts; that she told him that she was working on a small salary and could not afford to make those payments" of $25 monthly; and defendants "had promised that she would not need to make deferred payments." She went to see him "for the purpose of demanding her money back." Branham "stated that to help her meet the payments he would take back two of the lots and make the payments only $10.00 per month." "He reiterated his agreement to sell the two lots and stated that as it was fall they would not be able to resell until the following summer." Thereupon plaintiff on September 27, 1932, signed a contract for the purchase of lots 144 and 145 (in lieu of the two April contracts). The purchase price of these lots under the third contract was $1,425, the contract reciting

the payment of $861.34 cash (total of cash payments on April contracts, plus one installment payment under one of those contracts), the balance payable in $10 monthly installments. "The reason for the contract of September 27, 1932, being entered into was she could not keep up her payments on the other contracts." "On the occasion of signing the contract of September 27, 1932, she was told by Mr. Branham that he was going to resell the two lots but *probably* would not be able to resell them until the spring or summer of 1933; that she need not worry about deferred payments as they were going to sell the lots; that she believed his statement and had confidence in him because he was the head of the concern; that she signed the agreement acting upon said statement." (Italics ours.)

Five other ladies, each of whom had purchased property at Selby from defendants at about the same time as plaintiff's transaction, "testified that the defendants as an inducement to them to buy represented that they [defendants] would resell the properties within a short time at a substantial profit; that each of the ladies relied on the representations in making the purchases; that no effort had been made to carry them out, and that suit had been filed against the defendants."

At the conclusion of plaintiff's case, the court "expressed the opinion that a case of fraud had been proved against the defendants, but that by signing the contract of September 27, 1932, the plaintiff had waived the fraud, and therefore [the court] found in favor of the defendants."

Prior to entering into the third contract, plaintiff, in answer to notices that the monthly payments were due on the first and second contracts, went to see Branham because defendants "had promised that she would not need to make deferred payments"; her purpose being to demand "her money back." The demand for monthly payments naturally put in question defendants' good faith in making the representation that plaintiff would not be obliged to make monthly payments. Although plaintiff had visited the development several times during the summer and had been promised by Branham a number of times during that period that "he was going to sell her [plaintiff's] lots," the defendants' failure to resell likewise brought into question defendants' good faith in representing that they would resell at a profit. That this lack of good faith was brought home to plaintiff is apparent, for she testified

that she had become "suspicious they were not going to resell; that she knew they were not"; and that they had "made no efforts to sell her [plaintiff's] lots." Plaintiff's suspicions had crystallized into conviction when she determined to demand "her money back."

Under these circumstances, it can hardly be said that plaintiff was ignorant of the falsity of similar inducements employed to get her to sign the third contract and that she reasonably believed them to be true. Thus, since one of the conditions essential to warrant the setting aside of a contract in equity (i. e., the complainant must have been ignorant of the falsity of the representation, and reasonably believed it to be true. Southern Development Co. v. Silva, 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678), has not been established, the lower court was right in dismissing the bill.

Decree affirmed.

Affirmed