COMMERCIAL BANK OF PARIS *v.* P. R. CALLENDER *et ux.*\*

## (*Jackson.* April Term, 1924.)

1. **VENDOR AND PURCHASER.** In action for price of chicken farm, representations as to number of chickens held not to bind seller to deliver fixed number.

   In suit for price of chicken farm, in which defendant sought to establish set-off because of misrepresentations in advertisement of farm as to number of chickens, deed however not specifying any number, evidence *held* to show that number of chickens was not regarded as material in fixing price and that it was not intended to bind seller to deliver fixed number of birds. (*Post, pp.* 320-325.)

2. **VENDOR AND PURCHASER.** Purchaser of chicken farm inspecting premises held not entitled to relief because of misrepresentations as to number of chickens.

   Where defendant, before purchasing chicken farm, inspected premises and chickens sold with them and noticed that there was deficiency in number of chickens as advertised and had an opportunity to ascertain exact facts, *held*, in suit for price, that he could not have relief in equity on his claim of set-off on ground that number of chickens was misrepresented. (*Post, pp.* 325-327.)

   Cases cited and approved: Morgan v. Snapp, 7 Porter (Ind.), 537; Bolton v. Branch, 22 Ark., 435; Grider v. Clopton, 27 Ark., 244.

   Cases cited and distinguished: Southern Development Co. v. Silva, 125 U. S., 247; Meland v. Youngberg, 124 Minn., 446; Pearce v. Suggs & Petit, 85 Tenn., 735.

---

\*Headnotes 1. Vendor & Purchaser, 39 Cyc, p. 1973; 2. Vendor & Purchaser, 39 Cyc, p. 1263.

---

### FROM HENRY.

---

Appeal from the Chancery Court of Henry County.—Hon. Thos. C. Rye, Chancellor.

Lewis & Rhodes, for plaintiff.

Bryant & Bryant, for defendants.

Mr. Justice Chambliss delivered the opinion of the Court.

This bill was filed to recover judgment on certain purchase-money notes and to enforce a lien upon the property conveyed. Defendants admit execution of the notes, but by cross-bill seek to establish a set-off because of the alleged failure of consideration in part, charging that misrepresentations were made as to certain of the property sold.

Complainant bank having acquired certain lands and buildings, equipment, and poultry located in or near Paris, advertised the same for sale as a whole for $9,000. Defendant Callender thereupon visited the property and inspected it and later offered $7,000 therefor, $1,500 in cash and the balance in the notes sued on. A deed was executed and delivered, naming the consideration and describing the parcel of land, "with all of the appurtenances thereto belonging;" also the following described personal property:

"All of the Ancona chickens, incubator machines, brooders, brooder stoves, feed, supplies, office, wiring and plumbing fixtures, and all other machines and conveniences used in connection with said poultry yard."

In the advertisement, confirmed by a letter written by an agent of the bank, the property proposed to be sold was described as follows:

"Ancona poultry plant for sale at a great bargain consisting of three acres of land; two new brooder houses two hundred and ten feet long; one two hundred and eighty; three forty; one brick incubator house forty feet long; eight houses for other purposes. All buildings first class and new. One each, six and seven Buckeye incubator; fifty brooders; wiring, plumbing, heaters and other equipment eight hundred each Ancona hens and pullets; two hundred younger; thirty cocks, one hundred thirty cockerels. Plant besides birds cost $24,000 to equip. To wind up an estate will sell immediately the entire plant and birds for $9,000. Apply to W. C. Johnson, Paris, Tenn."

Some weeks after the purchase was completed and the papers passed and the defendants had been in possession, it is alleged in the cross-bill that a careful count of the birds disclosed a large shortage, and it is insisted that cross-complainants are entitled to a credit upon their indebtedness for this deficiency; it being insisted that the birds were of large relative value and that there was a misrepresentation in this regard which was material.

For the bank it is contended: First, that there was no misrepresentation as to the number of birds on hand at the time of the sale; second, that the purchaser was not only afforded every opportunity to satisfy himself as to the number of birds on the chicken farm, but that he was affirmatively put upon notice that the seller neither knew the number nor believed the number to be as great

as now alleged by the purchaser to have been represented as on hand; and, third, that the deed of conveyance is controlling, being the written memorandum of sale, and that this not only fails to set out any number of birds, being thus a sale in gross, but that at the time of the execution of the deed the purchaser was expressly put upon notice that the sale was of no specific number of birds, but of such only as were at the time on the yards.

The chancellor was of opinion that the equities of the cross-bill had been fully met by the answer thereto and that its allegations had not been sustained, and he dismissed the cross-bill and gave judgment for complainant on the notes. From this decree appeal was taken.

We have carefully considered the testimony in this case, in view of the conflict of evidence and the earnestness with which the contention of the defendants below has been urged, and we are constrained to the opinion that the decree of the chancellor is sustained by the evidence of the defendant below in several particulars.

In the first place, we think it quite apparent that the controlling consideration with defendant Callender was not the number of fowls, but the plant, its location, improvements, and equipment. In his letter of November 16, answering the advertisement above quoted, he says that he is ''writing for details.'' He then proceeds to set out the ''details'' in which he apparently was interested and inquiries as to the location, the character of the soil, the dwelling houses, and other improvements and equipment, but significantly makes no reference whatever to the stock of poultry. It is rather apparent from his very frank deposition that these were the matters that were controlling and influencing him, rather than the

150 Tenn.—21.

number of chickens on hand. It appears that when he visited the, plant, according to his own statement, he "went out to the plant, and started looking it over; we went through every building, I think; in fact I know we went through every building, looked into every building and took notice of the premises." He further says:

"We were out at the place probably about two hours. I looked over everything to see what buildings were electrically equipped, what pumped the water and about the incubators, practically everything. We were about two or two and one-half hours there."

It is therefore quite evident that he made a careful inspection of the premises and was given every opportunity to know what he was buying in that regard. Referring to the chickens, he says he "saw Henry Loving feed the chickens, that is about all of them, and looked over them, into every building that was on the place. First and last, at least three or four times, we spoke of the number of birds. I said according to the letter and ad there was one thousand nine hundred sixty birds on the place." There then follows this significant statement from Mr. Callender:

"On seeing them fed and therefore seeing practically all the birds on the place, I told Mr. Johnson (he being the representative of the bank present), on three or four occasions, that I didn't think there were one thousand nine hundred sixty birds there."

Mr. Johnson and Mr. Callender differ as to just what was said between them as to the number of birds on hand, Mr. Johnson testifying that he disclaimed any knowledge as to the number of birds and said to Mr. Callender that, while it had been represented to him

that there were some one thousand nine hundred birds or more on hand, he did not believe it. The significant fact already referred to is that Mr. Callender himself seems to have so expressed himself.

It further appears that several weeks later the birds were counted, first by Callender and a negro employee, and then recounted by Mr. and Mrs. Callender; Mrs. Callender stating that this count "was easily done," and it appearing that she and her husband made a count of the birds within a very short time and with comparative ease.

It thus appears, conceding that the number of birds was material and controlling in the transaction, that the purchaser was shown the birds and afforded every opportunity to ascertain for himself how many there were in the flock; that within a very short time he could have satisfied himself entirely on this point; and that, moreover, while the advertisement had stated the number of birds on hand at the time of its publication, upon an inspection he was himself satisfied before closing his sale that there was no such number of birds on the premises. There was no concealment and no apparent effort to mislead or deceive him. He must have recognized clearly that the figures used in the advertisement were not correct, and this was frankly conceded by the seller. We are forced to the conclusion that the number of the birds was not recognized, or treated by the parties, as determinative or controlling in the making of the contract of sale or fixing of the price. This view, as already suggested, is strongly supported by the language of the deed. If it had been the purpose of the purchaser to bind the seller to delivery of a fixed number of birds

as a part of the transaction, and if he was relying upon any representations previously made in this regard, manifestly he should have had it so provided in the writing entered into between the parties.

Conceding that the number of birds was material in the view of the purchaser, he has not exercised that care and diligence which was his legal duty to use in order to lay ground for a court of equity to interpose its relief. Although advised by the advertisement that a certain number of birds were on the premises to be sold, when he came to inspect these premises and the birds he not only had opportunity to verify the facts, but he received notice, in fact saw for himself, that there was a deficiency in number, and he cannot be excused for failure thereupon to embrace the opportunity which was freely afforded him to ascertain the exact facts.

As already stated, our conclusions have been based chiefly upon the frank testimony of Mr. and Mrs. Callender. Looking to the testimony of the witnesses of the complainant bank, these conclusions are strengthened; it being made clear that defendant Callender was afforded every opportunity to ascertain the facts, was affirmatively put upon notice that the figures used in the advertisement could not be relied upon but that he must look and act for himself, and finally that the sale of any specific number of fowls was expressly disclaimed in connection with the execution of the final transfer paper.

We have hardly felt it necessary to cite or quote from authorities in view of the facts as hereinbefore found, but the language of Mr. Justice LAMAR in the leading case of *Southern Development Co.* v. *Silva,* 125 U. S., 247, 8 Sup. Ct., 881, 31 L. Ed., 678, is applicable:

"Where the purchaser undertakes to make investigations of his own, and the vendor does nothing to prevent his investigation from being as full as he chooses to make it, the purchaser cannot afterwards allege that the vendor made misrepresentations."

And in *Meland* v. *Youngberg,* 124 Minn., 446, 145 N. W., 167, Ann. Cas., 1915B, 775, the court quotes with approval, among other statements of the rule, the following:

" 'Where one has the opportunity to examine for himself and fails to do it, but purchases on the representations of another, if he be deceived, he must suffer from carelessness and want of care. So, if in a case like the one at bar, where the means of information were not only accessible, but were availed of, and a personal examination made, equity will not allow him to say that he was induced to purchase on the statements and representations of the vendor. *Morgan* v. *Snapp,* 7 Porter (Ind.), 537; *Bolton* v. *Branch,* 22 Ark., 435; Adams's Equity, 179, 187.' *Grider* v. *Clopton,* 27 Ark., 244."

In the case at bar the purchaser did not elect to reply upon the representations in the advertisement and in the letter with regard to this detail which he now alleges to have been material, but visited the property and personally made an inspection which he could readily and easily have extended to a complete ascertainment of the exact facts.

This court has quoted with approval the following statement of the rule (*Pearce* v. *Suggs & Pettit,* 85 Tenn., 735, 4 S. W., 529):

"It has been said that equity would never give any relief from a mistake if the party could, by reasonable

diligence, have ascertained the real facts, nor where the means of information are open to both parties. Pomeroy's Eq., section 856, and cases cited; Story's Eq. Jur. 146-148.''

The decree of the chancellor must be affirmed.