# KATHRYN I. POLLOCK v. S. O. BANKSON.

Eastern Section. —— —, ——.

Bachman & Wilkerson, of Chattanooga, for appellant.
Sizer, Chambliss & Sizer, of Chattanooga, for appellee.

SNODGRASS, J. The original bill in the cause was filed May 31, 1927. To collect a note in the principal sum of $1666.66, with interest and attorney's fee.

The answer was filed June 22, 1927, denying that defendant was indebted to complainant in any amount.

It was admitted that he signed the note as Trustee, and while it was also admitted that he endorsed the note as an individual, waiving demand notice and process, he also claimed the endorsement was without consideration and that the note was executed by him as trustee for himself and another in the purchase from complainant of a tract of five acres of land in the out suburbs of Fort Myers, Florida, for which he had executed a mortgage deed conveying said five acres to complainant for the purpose of securing the payment of the said two notes (one being that sued on) all it was claimed under the representations to be thereafter detailed, and which it claimed was sufficient to avoid the note.

The answer then set out the facts to be that ''on December 7, 1925, and for some time previous thereto and for several months there-

after defendant was in Fort Myers, Florida, having been attracted to the place largely because of great activities then prevailing in the selling and buying of real estate. Complainant, or her agent in some way learned that defendant was probably a prospective purchaser of real estate. She, or her agent, approached defendant representing that complainant owned five acres of unimproved real estate to the north of Fort Myers and across the Caloosahatchie river. She, or her agent, carried defendant to see this acreage, which was wild and unimproved land without any road frontage, only a trail going by or through said five acres to a small home of some settler living in the piney woods in that vicinity. Said five acres was wholly unimproved, the soil consisting chiefly of white sand, as defendant is now informed and believes, costing complainant only a trifle, and the land was practically without value unless developments should be made in or near same. Defendant in effect made these observations and complainants, or her agent, in order to induce defendant to purchase said acreage held out and represented to him with great earnestness that developments in the vicinity of this property had been provided for and assured him that these developments would begin at once and be completed without delay. Complainant, or her agent, represented to this defendant that a street or boulevard would be built along the front or one side of this property and that just across this street or boulevard a large hotel would certainly be erected; that an artificial lake would soon be made and that one side of said five acres would front on this lake. It was further held out to this defendant that a yacht basin would be put in very near this property and that golf links would be laid out and finished without delay, said golf links as represented to be very near said five acre tract. Other representations were made to this defendant by complainant, or her agent, of large and wonderful developments soon to be made in the vicinity of this property. These representations were made to defendant by complainant, or her agent, to the end and for the purpose of creating in defendant a desire to purchase said five acres and defendant says that said representations fired his desire to purchase said acreage and he contracted to do so for himself and his associate in this deal, Emmett S. Newton. Defendant took title to said property as trustee for the use and benefit of himself and said Newton. No other person was interested with defendant in this deal. Because of said representations concerning said developments and improvements near said five acre tract complainant induced defendant to purchase said five acres for the fabulous consideration of $6,250. Of this amount defendant paid to complainant, or her agent, in cash at the time he signed said notes $2,916.68, and executed said two notes for $1,666.66 each, maturing on November 6, 1926, and November 6, 1927, respectively.

After complainant had procured defendant's cash and said notes and the mortgage deed aforesaid and after she had delivered to him deed purporting to convey said five acres to him, complainant's agent returned later to defendant and asked him to endorse said notes personally, which he did as an accommodation and in appreciation of the great favor complainant had conferred upon defendant, as he then thought, by allowing him to purchase such a wonderful piece of property, which would soon be a gem set in improvements consisting of good roads, magnificent buildings, sparkling lake and a yacht basin covered with yachts of happy and prosperous owners. No valuable consideration was paid to defendant to endorse said notes personally.

Defendant believed said representations made by complainant, or her agent, and candidly felt that he had made a good deal and continued to believe this until after July, 1926, he paying semi-annual interest on said notes on that date. When said semi-annual interest was paid it was still held out to defendant that he need not worry about said improvements that they would surely come along and that he had a good investment.

It was not long thereafter, however, until defendant began to see that complainant had sold a gold brick. None of said improvements were put in. It is true that there was some work done on said hotel and a little work done upon streets, but all this soon ceased. The proposed street is now in weeds and bushes, the little work that was done on the hotel has fallen into decay, the lake, the yacht basis and golf are "as a tale that was told," and said five acre tract remains now as it was when said intriguing representations as aforesaid were made to defendant; scrub palmettos covers its sandy surface and there is not the slightest prospect that any improvements will be made on or near said property within years to come, if ever.

Said false and fraudulent representations were known to be such at the time made, or could have been known as false and fraudulent by complainant by the exercise of ordinary care and diligence. Said representations as to said developments and improvements were made as definite existing facts, soon to materialize. Defendant relied upon same, said representations being the inducing cause of defendants purchasing said five acre tract and executing said notes.''

The foregoing is quoted from the answer as embodying its defense and giving the background of this case, though the Florida law as to foreclosure in the remaining portions of the answer is referred to seemingly as an insistence that that was the only remedy complainant had in the collection of the notes. The answer also set out the comparative present value of the property to be not over $75 and offers of compromises that had been made by the defendant and its declination by complainant insisting ''that a court of equity

will not permit complainant to force this defendant to pay to her the unconscionable sum of $6,250 for said five acres of real estate which is now and was at the time it was sold to defendant practically worthless and in no event worth more than $300 or $400.

In this attitude of the pleadings certain proof, the deposition of defendant S. O. Bankson, and of one G. M. Tuck, was taken and filed, and to the deposition of defendant was filed as exhibit "A" an abstract claimed to be the one delivered to complainant at or before the closing of his purchase of the land, and in which there appeared certain gaps in the chain of title from which it might have been inferred, that there were certain deeds absent from the record or that the title might be outstanding in other than the defendant.

Whereupon an application was made to amend the answer, and though the amendment sought to be filed and the application supporting it was made part of the record it was denied by the Chancellor who gave his reasons therefor as follows:

> "The application is for leave to set up an entirely different defense from that which was set up in the original answer under oath, and this defense is not a meritorious one. There is no allegation that the complainant did not have title in fact but only that there was a breach of an alleged condition precedent that she was to furnish an abstract showing a mercantile title in her. After accepting the abstract and holding it all this time he now says that he understands that it shows that she had no title, but whether it shows the truth or not defendant does not undertake to say. Application denied."

Defendant also made application supported by affidavit to file a cross-bill which was allowed to be done subject to all defenses.

To this cross-bill an answer was filed and the cause was heard on the original bill and answer and the proof taken thereunder and a decree was entered adjudging that the defenses against the payment of the note sued on are not sustained by the evidence and that complainant was entitled to recover on said note the amount due thereon with interest from May 6, 1926, the date to which interest had been paid according to endorsement on the back thereof together with 10% attorneys' fees, amounting in all to the sum of $2063.65, with all costs of the cause. However to his decree there was added:

> "But it further appearing that the defendant has filed a cross-bill in the cause alleging that complainant had not title to the tract of land for part of the purchase price of which the note sued on was given and it further appearing that the complainant is a nonresident without property in this State, it is further ordered that upon the execution by defendant of bond in the penalty of $250, with good security to be approved by the Clerk and Master, said bond to be filed in this cause, conditioned to

pay such damages and .further costs as may be hereafter decreed against the cross-complainant execution upon the foregoing judgment will be stayed until the further order of the court.''

An appeal was prayed from this decree but for the present was denied, the bond indicated was given.

The Chancellor's finding upon which this decree was entered, was made part of the record and is as follows:

''Bill to collect a note given as a part of the purchase price of a tract of land near Ft. Myers, Florida, sold to defendant upon the eve of the collapse of the real estate boom in that State. An answer alleging false and fraudulent representations by complainant and her agents in regard to improvements that would be made upon adjoining property.

''The evidence shows that defendant purchased the tract of land in question upon the strength of a commonly received report that the Hollywood Company, which one Elmer E. Jones appears to have been the head of, was going to lay out and develop a suburb of Fort Myers upon an adjoining tract of land and to this end makes various extensive and expensive improvements thereon. The boom burst and the improvements were never made. But there were no fraudulent representations. Complainant's agents believed the report. Defendant himself believed it independently of anything the agents told him. The whole town believed it. Defendant bought on his own judgment. because he thought he saw an opportunity to make a profitable speculation.

''There is no merit in this defense and complainant will have a judgment for the amount of the note, principal and interest and 10% attorneys' fees and costs.

''But it appearing that the defendant has filed a cross-bill in this cause alleging that the complainant had no title to the said tract of land and it further appearing that complainant is a nonresident without property in this State, it is ordered that execution upon said judgment be stayed until the further order of the court upon defendant giving a bond to pay such damages and further costs as may be decreed against him in this cause.''

Further proof was taken upon the issue thus left by the cross-bill for determination and the cause finally heard on the 23rd day of January, 1929, on the cross-bill of the defendant and the answer thereto, the testimony and the entire record in the cause, from all of which it was adjudged and decreed that the allegations of the cross-bill were fully met and denied in the answer of the original complaint thereto and were not sustained by the proof and that the

cross-complainant was not entitled to the relief prayed in the cross-bill. Accordingly the same was dismissed and the execution held up on the original decree was released and complainant and his securities were adjudged to pay all costs incident to the cross-bill.

A supplemental decree was also entered showing the Chancellor's action on certain exceptions to the evidence.

From this decree defendant and cross-complainant Bankson prayed for, obtained and has perfected an appeal to this court making assignments of error numbered from 1 to 7 inclusive. The first three are as follows:

"The Chancellor committed reversible error:

"1. In finding, holding and decreeing that complainant was entitled to recover from defendant $2063.65, because the evidence, without contradictions, shows that the land, for part of the purchase price of which the note sued upon was given, was sold to defendant and he was induced to purchase same because of extravagant and untrue statements as to pending and imminent developments on a vast scale in the vicinity of this property, he thereby being induced to agree to pay a price shockingly out of proportion to its real value. Those developments were not made and the land sold defendant was stripped of its speculative glamour and left on his hands without sale value, its value, if any, being not over $100 per acre, or a total of $500.

"2. In finding, holding and decreeing that the allegations of the cross-bill had been fully met by the answer and not sustained by the proof, because the cross-bill charges and the proof shows that cross-defendant had no title to the five acres she undertook to convey to cross-complainant, that title to the property was vested in Joel W. Corbitt, or his heirs, that she conveyed nothing to him and that there was a failure of consideration, properly interposed as a defense to the note sued upon.

"3. In not finding, holding and decreeing that the allegations of the cross-bill had been sustained by the proof; that cross-defendant had no title to the land sold cross-complainant; that title to the land was vested in the heirs of Joel W. Corbitt at the time of the execution of the note sued upon, and still remains in them; that there was a breach of the covenant of seizen; that there was a failure of consideration, and that the note sued on, and the other note for a like amount and for the same purpose, be cancelled and surrendered to cross-complainant."

The other four relate to the Chancellor's actions as to evidence set out in each assignment, and without encumbering this opinion with

here setting out what it was in detail we incorporate same by referring to it as appearing in appellant's assignment on pages 20, 21 and 22 of his brief.

We are of opinion that no error appears in overruling the exceptions contained in the fourth and fifth assignments. Whatever infirmity may have attached to this evidence regarding its weight it was neither irrelevant nor incompetent, under the pleading. While it is true this record is not a proceeding to set up a lost instrument, it is a proceeding as it finally shaped itself to defeat the collection of the note upon the ground that no title was communicated to the cross-complainant in the deed that was executed to him by the original complainant Mrs. Pollock, in the absence of any deed from Joel W. Corbitt, the last grantee in whom the record showed the title to the five acres vested. The witness was Anthony C. Corbitt, the next grantor appearing in the abstract, who testified to a deed to the property that had previously been made to him by the said Joel W. Corbitt, and which after delivery to him he had sent to Key West stated to be the county seat of Monroe county at that time in which the land was situated, and that this deed with others of his was lost before record in the fire that destroyed the clerk's office.

Defendant insists that this evidence was incompetent and irrelevant under the pleadings.

Under the situation as it existed the burden was upon the cross-complainant to show that no title was communicated to him and he had only offered one circumstance, the absence of a recorded deed from Joel W. to Anthony C. Corbitt to carry his burden.

Without reference as to whether that was sufficient to shift the burden to other obligation to show an execution and delivery of a deed by the said Joel W. to the said Anthony C., that issue was involved as an incident of proof, determinable upon the best evidence that was available at the time and not required to await the exigency of a formal setting up of the instrument itself so as to be offered on the trial as record evidence proving the fact previously vitalized by a decree under proper issues and parties.

Manifestly therefore the issue as it was raised here by the pleadings of deed or no deed had to be established by verbal proof both as to the execution, delivery and contents as it was shown to have been lost before registration. Its registration under the facts of this case cuts no figure. The simple execution and delivery of an instrument is sufficient to vest title to land as between the parties when it is so intended.

For the same reason the testimony of the witness Daniel J. Moore who had seen the deed and had had it in his possession and had turned it over to one J. H. Daughtry was both relevant and competent and the objection thereto as contained in the 5th assignment was properly overruled.

Some strictures were made in appellant's brief on apparent discrepancies in the proof and the mention of a Daughtry to whom the deed seems also to have been turned over, whose name does not appear in the abstract or title to the 5 acres in question, and some deductions made as to the deed being sent to Key West, regarding which we concur in the observations made in the brief of appellee as follows:

"It is of course immaterial when or to what place Anthony Corbitt sent the deed in question to be recorded. The witnesses were testifying as to events which occurred nearly thirty years before their depositions were taken and it is quite possible they are mistaken as to some of the dates, and it is even conceivable they may have sent the deed to the wrong place to be recorded. The material and important fact to which he testified, however, is the existence of the deed from Joel; and on this point the three witnesses are positive, and they could hardly be mistaken.

"As to the reference to a sale to a man named Daughtry, it will be seen that the conveyance from Anthony Corbitt to Daniel Moore embraced a tract of twenty acres.

"The land in question in this case is only five acres of this twenty acre tract and it is quite possible that a portion of the twenty acres may have been conveyed to the man Daughtry referred to in Moore's testimony."

The sixth objection is as to a statement made by E. M. Moore, wife of Daniel J. Moore in response to the following question. Q. Did you hear Mr. Moore state that at one time he had in his possession a deed from Joel W. Corbitt to Anthony C. Corbitt conveying this land? A. Yes, sir.

Even if this evidence should not be competent as confirmatory, but rather that it was incompetent as hearsay, the evidence of the two men regarding the existence of the deed, was not contradicted, and it became immaterial.

The evidence of D. M. Pollock to which the 7 assignments relate is as follows:

"This piece of property was purchased by Mrs. Pollock from Roland T. Halton, of High Point, North Carolina, and was sold by her to G. W. Clark, of Fort Myers, Florida. At the time of sale deed was made by Mrs. Pollock to G. W. Clark and tendered to him, but he asked that owing to the fact that he had just resold this piece of property to S. O. Bankson that deed be made direct from Mrs. Pollock to said Bankson. This was done, as requested.

"Q. Then, as you relate, Mrs. Pollock had no dealings of any kind with Mr. Bankson? A. Never. Mrs. Pollock nor myself had any business dealings with Mr. Bankson.

"Q. Did you have a written contract with Mr. Clark, or oral contract. A. We had a written contract.

"Q. Have you made any effort to locate this contract? A. I have, but have been unable to locate it."

It is insisted that the Chancellor should have sustained objection to this because incompetent and irrelevant in that (a) it contravened the allegations of the original bill. (b) It undertakes to modify, alter or change a written contract, to-wit, the deed given by the original complainant and to witness to the original defendant. (c) Witness undertakes to tell conversations between himself and said Clark when defendant was not present in person, nor any one representing him. (d) The contract to sell Clark was in writing and was the best evidence of what it contained.

We do not think there was any error committed in overruling the exceptions. It was not in any contradiction to the manner in which the property came to be deeded to cross-complainant, but in explanation of the circumstances thereof. It was insisted that Clark and the other members of the real estate firm were agents of Mrs. Pollock and that she therefore was bound by the representations made to cross-complainants by them, whereas it appears that Clark represented himself as the purchaser to whom the abstract had been given, and that Clark in the meantime before closing his trade had himself sold the property to cross-complainants and by an arrangement later effected had caused Mrs. Pollock to make the deed to cross-complainant instead of himself. These facts we think were independently relevant and competent.

It is true that it was stated that the contract with Clark was in writing, the objection the oral testimony being merely that (d) the contract to sell to Clark was in writing.

Pollock testified that he had made an effort to locate the contract but had been unable to locate it. There was no objection appearing that the loss of the contract had not been sufficiently proven as to admit oral testimony. Besides the other matters, regarding the claim of title or such parts of it as was covered by the oral evidence was not in dispute.

The Chancellor's opinion covering the disposition of the case made by the cross-bill and issues thereon, and made part of record is as follows:

"The abstract of title shows, and the facts is, (are), that complainant had a connected record chain of title by mesne conveyances from Anthony C. Corbitt and wife to herself. But the land was granted by the state of Florida to Joel W. Corbitt in 1906, and there is no record of any conveyance out of Joel W. Corbitt or unto Anthony C. Corbitt.

"If the contract between complainant and defendant were an executory one, this defect in the title would have justified the defendant in refusing to accept it. But defendant accepted the title and took a deed of conveyance from complainant, with a covenant of general warranty and other covenants including that of seizin. In this situation defendant cannot successfully resist the payment of the purchase money unless he shows a breach of the covenants in fact.

"There was no fraud in the transaction on the part of complainant. She submitted to defendant, or rather to Clark, the same abstract of title upon which she purchased the property, and defendant had every opportunity to examine it before he took the deed from her.

"The fact is that Joel W. Corbitt conveyed the land to his brother Anthony C. Corbitt by deed. This deed the latter held until he conveyed the land to Daniel J. Moore in 1890, and then sent it along with other deeds to the recording office at that time in Key West, where it and his other deeds were dstroyed by a fire which destroyed the court house. The date and a substantial copy of the deed are not shown as would seem to be required by sections 3265-3267 of the revised statutes of Florida, for the judicial establishment of lost papers, but that Joel W. Corbitt did make such conveyance to Anthony C. Corbitt is wholly undisputed in the evidence in the cause. The other facts in the evidence are corroborative. Anthony C. Corbitt was in possession of the land for four years, before he conveyed it to Moore. His deed to Moore was recorded in 1892. Joel W. Corbitt must have lived for at least ten or twelve years after the deed by Anthony C. Corbitt was recorded, but neither he in his lifetime nor his heirs or anyone for them after his death has ever asserted title to the land against said deed.

"Florida has a statute, passed May 22, 1925, which by its terms would seem to perfect the record title of complainant, but as the validity and construction of this statute appears not to have been passed upon by the court of last resort of that State, I base my decision upon the fact of the deed.

"It results that the cross-bill must be dismissed, and that complainant have execution of the judgment heretofore rendered in her favor."

From the record we concur in this opinion, which we think is the only conclusion from the facts that could be made.

The original disposition of the case removed all questions of fraud that might have affected the validity of the deed, and we think properly so.

Complainants own allegations and proof show him to have been a victim of a psychology originating in an unparalleled combination of circumstances affecting conditions and real estate values in Florida at the time of his purchase.

It was not a question as it appears, of purchasers but as to finding something that was uncopped to sell and at prices that were or had been advancing to unheard of levels, what was represented to him by these real estate agents who represented themselves (Mrs. Pollock knowing nothing about it) was not only it appears believed in by them, but by everybody, and the champion guarantee underlying most if not all their inflated hopes was not founded in what Clark and his company of real estate agents could do or represented that they could or would do, but in the specious promises of what other syndicates representing supposed millions were going to do with an addition, fronting so favorably upon this particular five acres.

The proof does not show any connection of the owners of this tract with this company or syndicate that was relied upon to create all the improvements that were to reflect and infuse other value into this small adjoining tract which seems to have been fortunately at the time owned by Mrs. Pollock who had agreed to sell it to Clark, the defendant assuming, as was thought, in time to make a speculative investment before the wild orgie had reached its peak.

In this connection, omitting simply the reference to the record, we quote with approval a section of the brief of Mrs. Pollock's counsel as it related to the claim of fraudulent representations as affecting the title he received.

"(a) If defendant had proved all the representations alleged in this answer they would not have entitled him to avoid payment of the note. In the first place he went out and examined the property and saw its condition for himself; and having as good an opportunity as the complainant of ascertaining all facts regarding it he cannot complain of any alleged misrepresentation. Perkins v. McGavock, Cooke, 415; Oliver v. McLean, 2 Shan., 280; Bridges v. Robinson, 2 Tenn. Chy., 720-724; Knuckolls v. Lea, 10 Humph., 577; Sou. Dev. Co. v. Silva, 125 U. S., 247; Pomeroy's Eq. Jurisp., Secs. 893-894.

"In the second place the alleged representations were necessarily mere expression of opinion, or promises as to what would take place on the property or be done in the future, and statements of that character are not actionable. Landreth v. Schevenel, 102 Tenn., 486; McElya v. Hill, 105 Tenn., 319; 26 C. J., p. 1079, et seq.

"It is not alleged that it was represented that complainant would herself make the improvements and developments re-

ferred to or that she owned or controlled the property on which they were to be made.

"(b) When the defendant came to take his testimony, however, he utterly failed to prove any of the alleged representations. The exact facts of the situation are that defendant was one of the numerous army of get-rich-quick speculators who flocked to Florida during the late boom, expecting to make a large amount of money on a very small investment. He went down to Fort Myers and spent about thirty days prospecting around prior to the purchase of this property. He never saw either the complainant or her husband; and the only representations to which he testified consisted of what "everybody in town" and the newspapers and the real estate agents who had charge of the proposition were saying about what was going to be done, on a contemplated sub-division adjacent to the complainant's five acre tract, which was known as Hollywood. He made the purchase of this property through a real estate agent named Tuck of the firm of Clark & Tuck; and he thought if everything that was being talked about was done he would make a good trade. He bought the property purely for speculation and with the hope that he could sell it to someone else at a profit.

"Within about thirty days after he had purchased however, the Boom "seemed to be evaporating" and his dreams of a quick and easy profit were dispelled.

"He says that the substance of the representations made to him by the real estate agents was that "with all these improvements that were anticipated and planned it would enable me to make a profit on the land;" that there seemed to be no doubt in anybody's mind that the improvements would be made; that he thought so and Clark & Tuck thought so, and the other dealers as well.

"The deposition of Mr. Tuck was also taken on behalf of defendant, and he says that while there was great excitement over the expected developments on the Hollywood additions, he did not undertake to guarantee or assure Bankson as to whether the developments were going to be carried out, and Bankson knew as much about it as he did, and "maybe more."

"Mr. D. M. Pollock, the husband of the complainant Kathryn Pollock, in whose name as administrator the suit was revived after the death of his wife, testifies that he, on behalf of his wife, sold this land to G. W. Clark, of the firm of Clark & Tuck; that when they came to make the deed Clark requested they make it direct to defendant Bankson, and they did this as requested; and that he had no dealings or transactions with Bankson, and never met him.

"On these facts the Chancellor held that there was no merit in the defense that defendant was induced to purchase the property by false and fraudulent representations and that he was liable on the note."

As indicated we think that after settlement of the questions of fraud the only question left was that raised by the cross-bill as to whether or not title was actually lodged in cross-complainant in the deed of Mrs. Pollock to himself which the cross-bill denied alleging that it was outstanding. As a preliminary to this lodgment registration was not essential. The cross-complainant had been given a warranty deed and there was nothing in the way of adding actual possession to the constructive possession which as the Chancellor, in effect, held passed to him through the deed of Mrs. Pollock.

The proof does not show any breach of covenant in the deed held by cross-complainant entitling him to sue or any damage resulting therefrom. The fact that the abstract of the recorded deeds did not show a perfect title is not the question. That there was a break in the chain of title so far as the record was concerned would or should have been apparent to a mere layman who had the intelligence to examine it much less to a man experienced in the real estate business as cross-complainant was shown to be. However it did not follow from this that title did not exist, though it is insisted in the brief of appellant that S. C. Headly, the abstractor who made the abstract of title and the extension thereof which are found in the record, testified that he had carefully examined and re-examined the public records of Lee county, Florida, touching title to the tract involved in this litigation, and that his definite conclusion and testimony is that the title to said five acre tract never passed out of Joel W. Corbitt to whom it was granted along with other property, by state deed dated Dec. 10, 1835.

It is manifest that he was only testifying as to what appeared from the recorded deeds, and to the same effect and with more accuracy was the testimony of Mr. Geo. D. Preston, a title attorney; but the question was not so much as to what the record showed. though it was competent and valuable as far as it went, but as to the one time existence of what it failed to show, is a deed from the said Joel W. Corbitt to Anthony C. Corbitt for the land; for if such a deed had ever conveyed the land to him, it is manifest that the title would not revert to his heirs should the deed happen to ' . lost or destroyed. That this deed had been in existence as vesting title in Anthony C., was sufficiently proven we think by the testimony of the latter and by D. J. Moore, without regard to the testimony of Moore's wife.

Appellant is therefore mistaken in his insistence that title was in the heirs of Joel W. Corbitt and that therefore there was not made

670

to him livery of seizin. The covenant of his grantor that she was lawfully seized and possessed of the land in fee simple does not therefore appear to have been broken.

We have no more cared to pass upon the effect of Chapter 1071 of the acts of Florida than the Chancellor did. It was passed in 1925 and does not appear to have been passed upon by any Florida Court. No Florida law has been shown making ineffectual, until registration, a deed that had as a matter of fact been executed, delivered and received with the intent that it should vest title.

While we sympathize with cross-complainant in the disastrous results of his venture we think under the proof he can claim no other salvaging consolation than that afforded him in what remains of value in his purchase. Without any proof saddling the original complainant with any invalidating responsibility or commitment of liability we cannot say that her deed was void or find any circumstance justifying us in robbing her of the fruits of her wise business sagacity in taking advantage of the fortuitous circumstances that for a time communicated a speculative value to her land. We think it appears that cross-complainant was the victim of his own folly and if he has survived that vortex of changing fortunes with solvency he has reason to congratulate himself for no doubt many like him were financially engulfed.

The assignments are all overruled and the decree of the Chancellor is affirmed with costs against appellant and his securities.

Portrum and Thompson, JJ., concur.